## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION** | § § § | |
| **Plaintiff,** | § § | |
| **vs.** | § § | **CIVIL ACTION NO. H-05-3377** |
| **CHEVRON PHILLIPS CHEM CO., LP** | § § § | |
| **Defendant.** | § | |

## DEFENDANT CHEVRON PHILLIPS CHEMICAL COMPANY, LP'S
## MOTION FOR SUMMARY JUDGMENT

SCOTT R. MCLAUGHLIN
State Bar No. 00791234
SD TX ID No. 18138
SHOOK, HARDY & BACON L.L.P.
600 Travis, Suite 1600
Houston, TX   77002-2911
Telephone:      713/227-8008
Telefax:          713-227-9508
E-Mail:           smclaughlin@shb.com

ATTORNEYS FOR DEFENDANT, CHEVRON
PHILLIPS CHEMICAL COMPANY, LP

OF COUNSEL:
MARLENE WILLIAMS
State Bar No. 24001872
SD TX ID No. 22824
E-Mail:       mwilliams@shb.com
MARNI MAGOWAN OTJEN
State Bar No. 24046568
SD TX ID No. 567838
E-Mail:       motjen@shb.com
SHOOK, HARDY & BACON, L.L.P.
600 Travis Suite 1600
Houston, TX  77002-2911
Telephone:      713/227-8008
Telefax:          713-227-9508

230315v1

## TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................................1

II.     STATEMENT OF UNDISPUTED FACTS ..........................................................2

    A.      Netterville's Employment With CPChem ..............................................2

    B.      Netterville's Belated Disclosure And Purported Requests for
        Accommodation...........................................................................................3

    C.      The Investigatory Meeting With Netterville..........................................7

    D.      CPChem's Decision to Terminate Netterville .......................................8

    E.      Netterville's Effort at Revisionist History.............................................8

    F.      The EEOC Administrative Proceedings ...............................................10

III.    ARGUMENT & AUTHORITIES ......................................................................11

    A.      The EEOC's ADA Claim Fails Because Netterville Was Not "Disabled" ...........11

        1.   Netterville was not "in fact" Disabled .............................................12

        2.   CPChem Did Not "Regard" Netterville as Disabled ......................14

    B.      The EEOC's ADA Discrimination Claim Fails Because CPChem
        Terminated Netterville for a Legitimate Nondiscriminatory Reason That
        was not Pretextual .....................................................................................16

        1.   The EEOC Cannot Meet the Overwhelming Legal Standard...........16

        2.   CPChem's Good Faith Belief, Whether Correct or Not, Whether
            Reasonable or Not, is Sufficient Basis for Summary Judgment.....................17

        3.   The Bases for CPChem's Decision Are Irrefutable.........................18

        4.   The Timing of Netterville's Termination Does not Support the
            EEOC's Discrimination or Retaliation Claims................................20

    C.      The EEOC's Retaliation Case Fails Because Netterville Did Not Engage
        in Protected Activity and Because Her Termination was Legitimate (as
        Discussed Above) ......................................................................................21

    D.      This is no Reasonable Accommodation Case.........................................22

        1.   Netterville was not Entitled to a Reasonable Accommodation .......22

        2.   Even if Entitled, Netterville was Granted Every Accommodation she
            Requested...........................................................................................23

CONCLUSION.....................................................................................................25

230315v1

# INDEX OF AUTHORITIES

## Cases

*Auguster v. Vermillion Parhis School Bd.*, 249 F.3d 400 (5th Cir. 2001) ......................................16

*Avant v. South Cent. Bell Tel. Co.*, 716 F.2d 1083 (5th Cir. 1983) ................................................18

*Blanks v. Southwestern Bell Commc'n, Inc.*,  310 F.3d 398 (5th Cir. 2002) .................v, 13, 15, 24

*Bryan v. McKinsey & Co., Inc.*, 375 F.3d 358 (5th Cir. 2004) ......................................................16

*Burch v. Coca-Cola Co.*, 119 F.3d 305 (5th Cir. 1997) ................................................................13

*Copeland v. Wasserstein*, 278 F.3d 472 (5th Cir. 2002) ................................................................19

*Davis v. Dallas Area Rapid Transit*, 383 F.3d 309 (5th Cir. 2004) ..............................................17

*Deas v. River West, L.P.*, 152 F.3d 471 (5th Cir. 1998) ................................................................15

*Dupre v. Charter Behavioral Health Sys. of Lafayette Inc.*, 242 F.3d 610 (5th Cir. 2001) ....11, 13

*Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723 (5th Cir. 1995)........................................................13

*E.E.O.C. v. R.J. Gallagher Co.*, 181 F.3d 645 (5th Cir. 1999) ................................................13, 14

*EEOC v. Louisiana Office of Cmty. Servs.*, 47 F.3d 1446 (5th Cir. 1995) ....................................17

*Ellison v. Software Spectrum, Inc.*, 85 F.3d 187 (5th Cir. 1996).............................................13, 15

*Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800 (5th Cir. 1997) ..........................................13, 23

*Gammage v. West Jasper Sch. Bd. of Educ.*, 179 F.3d 952 (5th Cir. 1999) ..................................24

*Giles v. Gen. Elec. Co.*, 245 F.3d 474 (5th Cir.2001)....................................................................11

*Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503 (5th Cir.),
*cert. denied*, 124 S.Ct. 66 (2003) ........................................................................................v, 15, 16

*Hamilton v. Southwestern Bell Tel. Co.*, 136 F.3d 1047 (5th Cir. 1999)........................................13

*Hanchey v. Energas Co.*, 925 F.2d 96 (5th Cir. 1990) .............................................................18, 24

*Ivy v. Jones*, 192 F.3d 514 (5th Cir. 1999) ...................................................................................16

*Mason v. United Airlines, Inc.*, 274 F.3d 314 (5th Cir. 2001),
*citing, Sutton*, 119 S.Ct. at 2149-50 .............................................................................................14

*Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086 (5th Cir.1995)....................................................17

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ...........................................................16

*Moore v. Eli Lilly & Co.*, 990 F.2d 812 (5th Cir. 1993) ...............................................................18

*Nawrot v. CPC Intern*, 277 F.3d 896 (7th Cir. 2002)....................................................................17

*Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318 (5th Cir. 2002) ..............................................21

*Price v. Federal Exp. Corp.*, 283 F.3d 715 (5th Cir. 2002) ..........................................................17

*Ray v. Glidden Co.*, 85 F.3d 227 (5th Cir. 1996)..........................................................................13

*Raytheon Co. v. Hernandez*, 124 S. Ct. 513 (2003) ......................................................................16

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)................................................16

*Richards v. Seariver Maritime Fin. Holdings, Inc.*, 59 F. Supp. 2d 616 (S.D. Tex. 1998)...........23

*Robinson v. Global Marine Drilling Co.*, 101 F.3d 35 (5th Cir. 1996)...........................................13

*Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468 (5th Cir. 2006)....................................15

*Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893 (5th Cir. 2002),
*cert. denied*, 123 S. Ct. 2572 (2003)............................................................................................18

*Seaman v. CSPH, Inc.*, 179 F.3d 297 (5th Cir. 1999)..............................................................20, 21

*Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183 (3d Cir. 2003) ..........................................22

*Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112 (5th Cir.1998) ...............................................v, 11, 13

*Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12 (1st Cir. 1997)...................................................23

iii

*Still v. Freeport-McMoran, Inc.*, 120 F.3d 50 (5th Cir. 1997) ......................................................13

*Sutton v. United Airlines, Inc.*, 527 U.S. 471, 119 S. Ct. 2139 (1999).....................................14, 15

*Swanson v. General Servs. Admin.*, 110 F.3d 1180 (5th Cir.1997)................................................20

*Talk v. Delta Airlines, Inc.*, 165 F.3d 1021 (5th Cir. 1999)............................................................13

*Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155 (5th Cir.),

*cert. denied*, 519 U.S. 1029, 117 S. Ct. 586, 136 L.Ed.2d 515 (1996).........................................23

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)........................................................16

*Toyota Motor Mfg., Inc. v. Williams*, 122 S. Ct. 681 (2002) ........................................................12

*Waggoner v. City of Garland, Tex.*, 987 F.2d 1160 (5th Cir. 1993)...............................................17

*Waldrip v. Gen. Elec. Co.*, 325 F.3d 652 (5th Cir. 2003)..................................................12, 13, 15

*Wallace v. Methodist Hosp.*, 271 F.3d 212 (5th Cir. 2001)............................................................16

*Weber v. Strippit, Inc.*, 186 F.3d 907 (8th Cir. 1999).........................................................v, 22, 23

*Workman v. Frito-Lay, Inc.*, 165 F.3d 460 (6th Cir. 1999) ...........................................................22

## Statutes

29 C.F.R. § 1630.2(i) ......................................................................................................................12

29 C.F.R. § 1630.2(j)................................................................................................................12, 14

29 C.F.R. § 1630.9...........................................................................................................................23

29 C.F.R. § 1630.9, App. (1995) .....................................................................................................23

42 U.S.C. § 12001..............................................................................................................................1

42 U.S.C. § 12102(2).......................................................................................................................11

42 U.S.C. § 12102(2)(C)..................................................................................................................14

42 U.S.C. § 12111...........................................................................................................................11

42 U.S.C. § 12203(a) .......................................................................................................................21

230315v1

## Nature and Stage of Proceedings

Discovery has been completed in this case and CPChem seeks dismissal of the EEOC's discrimination and retaliation claims under the ADA.

## Statement of Issues

CPChem asks this Court to grant summary judgment on the EEOC's claims against it. Specifically, CPChem asks the court to find:

(1) That Netterville is neither disabled "in fact," does not have a record of a disability, nor did CPChem ever regarded her as disabled. *See Sherrod v. Am. Airlines, Inc.*, 132 F.2d 1112, 1119 (5th Cir. 1998).

(2) Even if Netterville is disabled, which CPChem denies, CPChem terminated her for a legitimate nondiscriminatory reason—she falsified a post-offer medical questionnaire. *See Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 511 (5th Cir.), *cert. denied*, 124 S. Ct. 66 (2003).

(3) The EEOC's retaliation claim fails because Netterville did not engage in protected activity and CPChem terminated her for a legitimate nondiscriminatory reason. *See Blanks v. Southwestern Bell Communications, Inc.*, 310 F.3d 398, 402 (5th Cir. 2002).

(4) Netterville was not entitled to a reasonable accommodation. *See Weber v. Strippit, Inc.*, 186 F.3d 907 (8th Cir. 1999).

## Summary of the Argument

The EEOC alleges that CPChem wrongfully terminated Netterville because of her alleged disability and retaliated against her for allegedly requesting a reasonable accommodation. CPChem denies these allegations and requests the court to grant summary judgment on all of Netterville's claims.

v

230315v1

First, the EEOC has not present sufficient evidence to prove a *prima facie* case of disability discrimination under the ADA. **Netterville was not disabled under any definition of the ADA.** She was not substantially limited in her ability to perform at least one major life activity. Further, CPChem never regarded Netterville as being disabled because she was able to work and she was not limited in a major life activity.

Assuming *arguendo* that Netterville was disabled under the ADA, which CPChem denies, CPChem had a legitimate nondiscriminatory reason for terminating Netterville's employment. Netterville **intentionally omitted** information related to Chronic Fatigue Syndrome from her post-offer medical questionnaire. Netterville **falsified** an important human resources document related to her employment, and thus, CPChem released her from employment.

Next, Netterville has not provided sufficient evidence to present a *prima facie* case of retaliation under the ADA; therefore, her retaliation claim fails as a matter of law. Because Plaintiff was not disabled under any ADA definition she was not entitled to a reasonable accommodation. Therefore, **she did not engage in a protected activity under the ADA** by purportedly seeking a reasonable accommodation.

Finally, **this case should not be classified as a reasonable accommodation case**. First, Netterville is not disabled under the law, therefore, CPChem had no obligation to provide her a reasonable accommodation. Next, Netterville received the accommodations she requested, but failed to request the one that gives rise to the EEOC's failure to accommodate claim. Even if Netterville had formally requested a reasonable there was no vacancy or available position for her to occupy.

230315v1

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION** | § § § | |
| **Plaintiff,** | § § § | **CIVIL ACTION NO. H-05-3377** |
| **vs.** | § § § | |
| **CHEVRON PHILLIPS CHEM CO., LP** | § § | |
| **Defendant.** | § | |

## DEFENDANT CHEVRON PHILLIPS CHEMICAL COMPANY, LP'S
## MOTION FOR SUMMARY JUDGMENT

Defendant Chevron Phillips Chemical Company, LP ("CPChem") files this Motion for Summary Judgment against the Equal Employment Opportunity Commission ("EEOC") as follows:

### I.   INTRODUCTION

The EEOC sues CPChem asserting that it violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12001, *et seq.* The EEOC bases its lawsuit on CPChem's termination of Lorin Netterville ("Netterville") for falsifying a post-offer medical questionnaire. CPChem learned of Netterville's falsification when she disclosed her condition, Chronic Fatigue Syndrome ("CFIDS"), and asked for two weeks off to rest. After granting Netterville's request, CPChem investigated and concluded that Netterville had falsified a post-offer medical questionnaire. As demonstrated below, the indisputable summary judgment evidence shows that CPChem terminated Netterville for the legitimate nondiscriminatory reason of falsification of

230315v1

employment documents. Accordingly, this Court should grant its motion for summary judgment on all of the EEOC's claims.

## II.    STATEMENT OF UNDISPUTED FACTS

### A.    Netterville's Employment With CPChem

Netterville began working at CPChem through the Temp Connection around December 2000 (Netterville Dep. at 48).[1]  CPChem hired Netterville as its employee around April 16, 2001 (Netterville Dep. at 181).  When Netterville began her employment with CPChem, it was located in downtown Houston (Rugeley Dep. at 50).[2]  CPChem moved from downtown to its current corporate headquarters in The Woodlands, Texas in August 2002 (Rugeley Dep. at 50). Netterville claims that she worked a significant amount of overtime during this period, as she was responsible for the Specialty Chemical Group's move (Netterville Dep. at 177).    As discussed below, Netterville unsuccessfully attempts to tie CPChem's move to the recurrence of her CFIDS in an effort to prove that she did not lie on her post-offer questionnaire.

During her employment, Netterville reported to Gary Thurman, who at the time was CPChem's Customer Service Manager for Specialty Chemicals (Netterville Dep. at 48-49, 51; Thurman Dep. at 15-19).[3]    Netterville was employed as the Administrative Assistant to Thurman's group (Netterville Dep. at 48-49).  As such, she worked for Thurman, his supervisor Dan Coombs, and assisted various members of the Specialty Chemicals group (Netterville Dep. at 49-50).

After CPChem extended a conditional offer of employment to Netterville, but prior to hiring her, it required her to complete a post-offer medical questionnaire (Netterville Dep. at 176,

---

[1] Excerpts from Lorin Netterville's deposition are attached as Exhibit 1 and referred to as "Netterville Dep. at --."

[2] Excerpts from the deposition of Steve Rugeley are attached as Exhibit 2 and referred to as "Rugeley Dep. at --."

[3] Excerpts from Gary Thurman's deposition are attached as Exhibit 3 and referred to as "Thurman Dep. at --."

230315v1

181; Rugeley Dep. at 31).  At the bottom of the questionnaire, immediately above Netterville's

signature, is the following language:  **"I understand that any misrepresentation, false**

**statement, or omission herein may result in the company rejecting my application,**

**withdrawing any offer of employment, or terminating my employment at any time"**

(Netterville Dep. at 140, dep. ex. 11).[4]  Netterville signed the questionnaire on April 5, 2001

(Id.).

       **B.**      **Netterville's Belated Disclosure And Purported Requests for Accommodation**

On February 5, 2003, Netterville told Gary Thurman that though she had not told

CPChem about it, she had CFIDS and needed two weeks off to rest (Netterville Dep. at 75, 80-

82, 86-87, dep. ex. 6).[5]  She also gave Thurman materials she had printed off of the Internet that

described CFIDS (Netterville Dep. at 81-82, dep. exs. 4 and 5; Thurman Dep. at 101, dep. exs.

25 and 26).  Thurman granted Netterville's request for two weeks off at that time (Netterville

Dep. at 85; Thurman Dep. at 87).[6]

During her discussion with Thurman on February 5, Netterville also told Thurman that

her "blood work" was "bad," she was diagnosed with CFIDS "fifteen years ago," and that it had

been in "remission" until "two years ago"  (Netterville Dep. at 84-85, 108; Thurman Dep. at 47-

48, 89-90, dep. ex. 19).[7]  Netterville now claims that she was mistaken when she told Thurman

that CFIDS had resurfaced "two years" prior to their conversation on February 5 (Netterville

---

[4] This statement reflects CPChem's clear policy against falsification of employment documents (Rugeley Dep. at 48-49; Borths Dep. at 104-05).  All non-essential information has been redacted from Netterville's questionnaire.

[5] The note from Netterville's physician, Dr. Salvato, did not articulate any medical condition (Netterville dep. ex. 6).

[6] Netterville also sought short-term disability benefits for this two week period, though Thurman was unaware of this at the time (Thurman Dep. at 51; Netterville Dep. at 90-93; Borths Dep. at 66-67).

[7] In her deposition, Netterville claimed that perhaps she was not actually diagnosed with CFIDS in 1987, but she told the EEOC the same thing she told Thurman – that she was diagnosed with CFIDS in 1987 (Netterville Dep. at 165, dep. ex. 13).

230315v1

Dep. at 84-85). She claims that "brain fog" had impaired her memory at the time of her conversation with Thurman (Id.).[8] Netterville admits, however, that she made no effort to inform Thurman of her alleged error (Netterville Dep. at 85).

Accordingly, Thurman conveyed the content of this February 5 conversation with Netterville to Steve Rugeley, the Human Resources Business Partner for Specialty Chemicals (Thurman Dep. at 52-53, 89-90 dep. ex. 19). Rugeley, in turn, discussed it with Pete Borths, CPChem's Director of Labor Relations at the time (Borths Dep. at 26).[9] Borths suggested that Rugeley learn whether Netterville had disclosed information pertinent to CFIDS on her post-offer medical questionnaire (Borths Dep. at 26-28).[10] Borths believed that Netterville's statement to Thurman that CFIDS had resurfaced two years ago, which would have been shortly before CPChem hired her, begged the question of whether she had disclosed the condition (Id.).

Rugeley emailed CPChem's Medical Department, asking whether Netterville had disclosed information related to CFIDS in response to any of the questions on the questionnaire (Rugeley Dep. at 40-41, dep. exs. 6 and 14). Nancy Zamboras, a nurse in the Medical Department, responded that Netterville had not disclosed CFIDS and had responded negatively to a question asking about "blood disorders" (Rugeley Dep. at 40-41, dep. exs. 6 and 14). Rugeley copied Borths on his February 6 email string containing Zamboras' response regarding the questionnaire (Rugeley Dep. at 34, 40-41, dep. ex. 6). Rugeley involved Borths because Borths was the person within Human Resources who dealt with "cases," to ensure that CPChem

---

[8] Netterville claims to have "brain fog" as an alleged symptom of CFIDS (Netterville Dep. at 73-74).

[9] Excerpts from the deposition of Pete Borths are attached as Exhibit 4 and referred to as "Borths Dep. at --."

[10] Rugeley testified that it was his thought to check the medical questionnaire, based on Netterville's comments to Thurman that CFIDS has been "in remission" until "two years ago" (Rugeley Dep. at 29-30).

230315v1

handled them consistently (Rugeley Dep. at 25-26).[11]  Indeed, according to Borths, his role in this matter was to address the "disclosure" issue (Borths Dep. at 33).

On February 18, 2003, Netterville brought CPChem a purported work release from her physician, Dr. Patricia Salvato (Netterville Dep. at 130, dep. ex. 9).  Dr. Salvato's letter only states: **"released to return to full-time employment at a substation closer to home"** (Netterville Dep. at 130, dep. ex. 9).  Dr. Salvato's use of the term "substation" was confusing (Rugeley Dep. at 52; Thurman Dep. at 100).  Netterville claims that the letter referred to CPChem's plant located in Pasadena, Texas, but concedes that she has never heard of any CPChem plants referred to as "substations" (Netterville Dep. at 133).  Apparently, she now claims that this letter represented her request for a "reasonable accommodation" (Netterville Dep. at 128).

Nonetheless, Netterville *never requested* that CPChem allow her to work at a different location (Netterville Dep. at 130).  Further, she admits that no one at CPChem *had any reason* to believe that she needed to work at a different location as a reasonable accommodation (Netterville Dep. at 130).  Still, Netterville claims that Dr. Salvato's letter – which does not mention her medical condition, any work restrictions, or anything about Netterville needing an accommodation – should have put CPChem on notice that Netterville sought to work in its Pasadena plant, rather than its corporate headquarters, as a reasonable accommodation (Netterville Dep. at 130-134, dep. ex. 9).

However, Specialty Chemicals, the group to which Netterville was assigned, did not have any presence in the Pasadena plant (Thurman Dep. at 99; Netterville Dep. at 131).  Further,

---

[11] Borths testified that, prior to the formation of CPChem, while he was working for its predecessor, he had terminated another employee for falsification of a medical questionnaire that was similar, if not identical, to the one at issue in this case (Borths Dep. at 98-103).

5

CPChem *did not* have a transferable position in its Pasadena manufacturing facility (Rugeley Dep. at 50, 52-53; Borths Dep. at 30-31, 79-80).[12] More to the point, Netterville admits that *she never asked* Thurman or Rugeley or anyone else at CPChem to work at the Pasadena plant as a reasonable accommodation for her CFIDS (Netterville Dep. at 132, 134).[13] She claims that CPChem should have asked her what Dr. Salvato's letter meant (Netterville Dep. at 131). Clearly, Salvato's terse note did not articulate that working "at a substation closer to home" would be a reasonable accommodation for Netterville, as opposed to a mere convenience (Borths Dep. at 80; Netterville dep. ex. 9).

Next, on February 20, 2003, Netterville produced another, far more specific, letter from Dr. Salvato (Netterville Dep. at 134-35, dep. ex. 10). In this letter, Dr. Salvato stated, for the first time, that Netterville had CFIDS and needed a reasonable accommodation (Id.). Dr. Salvato wrote that Netterville needed the "reasonable accommodation" of alternating typing and reading and taking naps at lunch (Id.). CPChem implemented these accommodations (Netterville Dep. at 136; Thurman Dep. at 56). Indeed, the accommodations articulated in Dr. Salvato's February 20 letter were easily made by CPChem (Rugeley Dep. at 36-37, 53; Thurman Dep. at 55-56), although none of the CPChem employees involved in this matter viewed Netterville as "disabled" (Thurman Dep. at 58-59; Rugeley Dep. at 44-45; Borths Dep. at 54).

---

[12] Open positions were posted on CPChem's internal website and Borths specifically recalls that there were no open administrative assistant positions at the Pasadena location (Borths Dep. at 79-89). Accordingly, CPChem did not search for a position that did not exist at its Pasadena location (Id.).

[13] Netterville claims that she asked Thurman to "discuss" the letter and that he rejected her – a claim Thurman flatly denies based on the fact that he would not have dealt with return-to-work letters or requests because Human Resources or Medical would have (Thurman Dep. at 134). At best, this behavior is inconsistent with Netterville's previous behavior. In April 2002, she asked Thurman to allow her to work with her door closed and to come to work late on certain days – not due to any medical condition – but simply as a convenience to permit her to concentrate better (Netterville Dep. at 64, dep. ex. 3 ).

6

## C.     The Investigatory Meeting With Netterville

Rugeley met with Netterville on February 26, 2003 (Rugeley Dep. at 31). Thurman attended that meeting, but did not participate (Thurman Dep. at 62; Netterville Dep. at 107). In that meeting, Netterville (1) confirmed that she had been diagnosed with CFIDS "fifteen years ago" and (2) agreed that her CFIDS had been in "remission" until "two years ago" (Thurman Dep. at 114, 137-138, dep. ex. 37, 38; Rugeley Dep. at 32, dep. ex. 5, 16). Netterville claims that, in this meeting, she believes she cleared up the mistaken information she gave Thurman on February 5; however, she also *admits that she is not sure* because of her "brain fog" at the time (Netterville Dep. at 101-103).[14]

Next, Rugeley asked Netterville why she did not put the information related to CFIDS on her questionnaire (Rugeley Dep. at 42, dep. exs. 5 and 16; Netterville Dep. at 109-10). According to Rugeley and Thurman, Netterville replied that she *disclosed what was important* and did not think CFIDS affected her ability to work so she *chose* not to include the information about CFIDS on the questionnaire (Thurman Dep. at 60-61; dep. exs. 37 and 38; Netterville Dep. at 109-10; Rugeley Dep. at 40-41, dep. exs. 5 and 16). Netterville claims, regarding this conversation, that she had "foggy brain" and does not recall what she said during the conversation (Netterville Dep. at 101-103, 110). Thus, she cannot dispute Rugeley's and Thurman's description of the conversation (Id.).

---

[14] In fact, Netterville agrees that Thurman had every reason to believe that she was diagnosed with CFIDS fifteen years prior and that the condition had resurfaced two years prior (Netterville Dep. at 121-122). Thus, Rugeley and Thurman agree that, during the meeting on February 26, Netterville confirmed the allegedly mistaken information she had given Thurman on February 5, and Netterville cannot dispute this (Thurman Dep. at 114, 137-138, dep. exs. 37 and 38; Rugeley Dep. at 32, dep. exs. 5 and 16).

### D.    CPChem's Decision to Terminate Netterville

Based on Netterville's interview with Rugeley and Thurman, CPChem determined that Netterville intentionally omitted information related to CFIDS from the post-offer questionnaire (Borths Dep. at 41-42; dep. ex. 31; Rugeley Dep. at 40-41). CPChem formed this conclusion based largely on Netterville's statement in the interview that she chose not to put the information relating to CFIDS on the questionnaire (Borths Dep. at 41-42; Rugeley Dep. at 40-41).

Borths personally reviewed Netterville's questionnaire before CPChem terminated her (Borths Dep. at 46-47).[15] From his review, he concluded that Netterville had falsely answered clearly applicable questions, in particular the question pertaining to "excessive fatigue with work or exercise" (Borths Dep. at 46-47, 63). Accordingly, Borths articulated two bases for his belief that Netterville falsified the medical questionnaire: (1) the fact that she admitted that she had decided not to include information regarding CFIDS on the questionnaire; and (2) Borths' actual review of the questionnaire, in particular Netterville's "no" response to the question regarding "excessive fatigue with work or exercise" (Borths Dep. at 119-20).

Borths was the primary decision-maker regarding Netterville's termination (Borths Dep. at 119, 123-24; Rugeley Dep. at 24). Accordingly, Borths determined that Netterville should be terminated for falsifying the post-offer medical questionnaire (Borths Dep. at 43-44,119, 123-24; Thurman Dep. at 71).[16] CPChem terminated Netterville on February 27, 2003, for falsifying the post-offer medical questionnaire (Rugeley Dep. at 48; Borths Dep. at 54, dep. ex. 31).

### E.    Netterville's Effort at Revisionist History

---

[15] Neither Rugeley nor Thurman have ever looked at Netterville's medical questionnaire (Rugeley Dep. at 29-30; Thurman Dep. at 127).
[16] Zamboras played no role in the decision (Borths Dep. at 49-50).

230315v1

As already noted above, Netterville has revised her story regarding why she failed to disclose CFIDS on the questionnaire. For example, in her deposition, she claimed that the wording of the questionnaire caused her to answer "no" to the question about whether she had ever had excessive fatigue with work or exercise (Netterville Dep. at 144-45). Netterville admits that at the time she completed the questionnaire, she had experienced fatigue in her past – specifically in 1987 – but such fatigue was not *caused* by work or exercise (Netterville Dep. at 144). Rather, during that period, Netterville was fatigued "all of the time" (Netterville Dep. at 145).[17] Indeed:

Q. So, are you saying if this was worded differently, you might have put "yes"?

A. Yeah. If it had said something like "Are you tired all the time or have you ever been tired all time?" yeah, I would have put "yes." (Netterville Dep. at 144-145).

In an apparent effort to cover all possible bases, Netterville also claims that her CFIDS condition did not resurface until 2002 and was sparked by all of her alleged overtime work when CPChem was moving to The Woodlands (Netterville Dep. at 177). Netterville further insists that she did not visit Dr. Salvato about the recurrence of CFIDS until July or August 2002 (Netterville Dep. at 177-78). However, Dr. Salvato's medical records, obtained by CPChem via subpoena, demonstrate that Netterville began visiting Dr. Salvato again in June 2001 (Salvato Records at Chev 000628).[18] More to the point, throughout her medical record in June 2001, *Netterville reports "fatigue" as a condition in her past medical history and as an adult illness.* (Salvato Records at Chev 000628 and 000632).

---

[17] Netterville also testified that CFIDS is hereditary and that she was also aware that both of her sisters, her father, and many of her cousins have had CFIDS (Netterville Dep. at 167-169). Nonetheless, Netterville also claims that she did not disclose CFIDS on the questionnaire because she had convinced herself that she did not have the condition and, thus, "there would be no reason to think about disclosing it" (Netterville Dep. at 109).

[18] Medical Records of Dr. Salvato are attached as Exhibit 5 and referred to as "Salvato Records at Chev --."

230315v1

Overall Netterville claims that she spends a lot of time in bed, has "foggy brain," does not "have a life," sleeps excessively, does not sleep at all without medication, and has vision problems several times per month (Netterville Dep. at 160-164). But all of these alleged problems notwithstanding, Netterville is still able to work (Netterville Dep. at 163).

### F.    The EEOC Administrative Proceedings

Netterville initially filed her EEOC charge on March 26, 2003, claiming that she had been discriminated against by CPChem because it "regarded" her as disabled (Netterville Dep. at 155-56, dep. ex. 12). Five months later, *after the supposedly neutral EEOC investigator suggested it to her*, Netterville amended her charge to also claim that CPChem retaliated against her (Netterville Dep. at 155, 158). Not surprisingly, Netterville does not know what her charge means where it says that she was "regarded as" having a disability and thus cannot say precisely who she accuses of regarding her as disabled (Netterville Dep. at 156-57). She is likewise mystified regarding what action by her resulted in alleged retaliation by CPChem, *responding to that question by stating "I'm thinking"* (Netterville Dep. at 157-58). Ultimately, she again stated that the EEOC's investigator, Olga Castenada, suggested that she add the retaliation allegation, saying "Lorin, this is what we think and we want you to sign it" (Netterville Dep. at 158).

Borths responded to Netterville's EEOC charge by formulating and sending a position statement on behalf of CPChem to the EEOC (Borths Dep. at 113-14, dep. ex. 31). In the position statement, Borths made clear that CPChem terminated Netterville for falsifying her medical questionnaire and specifically noted her dishonest answer to the question concerning "excessive fatigue" (Borths Dep. at 106, dep. ex. 31). Ultimately, and inexplicably, the EEOC

10

issued a "cause" finding and, after this matter languished at the EEOC for nearly two years, filed this lawsuit.[19]

### III.   ARGUMENT & AUTHORITIES[20]

#### A.   The EEOC's ADA Claim Fails Because Netterville Was Not "Disabled"

To establish its *prima facie* ADA case, the EEOC must prove that Netterville was a "qualified individual with a disability and that the negative employment action occurred because of the disability." *Sherrod v. Am. Airlines, Inc.,* 132 F.3d 1112, 1119 (5th Cir.1998).   A "qualified individual with a disability" is someone who has a disability but who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."   42 U.S.C. § 12111; *Giles v. Gen. Elec. Co.,* 245 F.3d 474, 483 (5th Cir.2001).

The term "disability" as it is used in the ADA means: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment;[21] or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2); *Dupre v. Charter Behavioral Health Sys. of Lafayette Inc.*, 242 F.3d 610, 613 (5th Cir. 2001).   In her EEOC charge, Netterville only claims to have been "disabled" under the third prong of the definition, "being regarded as having such an impairment," though it appears

---

[19] CPChem previously filed a motion for summary judgment against the EEOC in this matter based solely on its failure to meet its statutory duty to conciliate. See Docket Entry 9.   Judge Vanessa Gilmore, who previously had this case, denied CPChem's motion without explanation, then recused herself several months later. See Docket Entries 24, 27.

[20] This Court is well-familiar with the applicable summary judgment standards and CPChem does not repeat them here.   Obviously, it is CPChem's position that there are no genuine *and* material disputed facts requiring trial of this matter.

[21] CPChem has no reason to believe that the EEOC intends to assert that Netterville has a "record of such an impairment."   Nonetheless, there is no evidence that Netterville had a "record" of a substantially limiting impairment and, from an abundance of caution, CPChem moves for summary judgment on this issue also.

11

that the EEOC is also contending that she was "in fact" disabled.[22] *See* Complaint at ¶ 10, 16. For the reasons discussed below, Netterville was not a "qualified person with a disability" because she was not "disabled" within the meaning of the ADA and summary judgment should be granted on the EEOC's ADA claim.

### 1.    Netterville was not "in fact" Disabled

For Netterville to have been "disabled" under the first prong of the ADA's definition of "disability," she must have in fact had an impairment that substantially limited her ability to perform at least one major life activity. *Waldrip v. Gen. Elec. Co.*, 325 F.3d 652, 655 (5th Cir. 2003) (stating that the substantial-limitation requirement is the "linchpin" of the ADA's definition of "disability"). "Major life activities" are activities such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. 29 C.F.R. § 1630.2(i). Whether Netterville's impairment, CFIDS, was substantially limiting is determined in light of: (1) the nature and severity of the impairment; (2) its duration or expected duration; and (3) its permanent or expected permanent or long-term impact. 29 C.F.R. § 1630.2(j).

"The effects of an impairment ***must be severe*** to qualify as a disability under the ADA." *Waldrip*, 325 F.3d at 655 (footnote omitted, emphasis added). Indeed, one who is able to perform the activities that are of central importance to the daily lives of most persons is not disabled under the ADA. *Toyota Motor Mfg., Inc. v. Williams*, 122 S.Ct. 681, 694 (2002)

---

[22] It is inappropriate for the EEOC to have expanded its lawsuit beyond the charge Netterville filed. This is especially so given that the EEOC advised Netterville regarding the content of her charge.

230315v1

(plaintiff with carpal tunnel syndrome who was able to perform activities of central importance to most persons was not disabled under ADA).[23]

If the EEOC does claim that Netterville was "in fact" disabled, its claim fails for several reasons. First, there is no evidence in this record that Netterville's condition, CFIDS, is "severe" or "permanent." Indeed, Netterville's own testimony indicates that the condition may disappear for a period of years, and fluctuates in terms of severity. Also, Netterville claims that the condition requires her to rest excessively on weekends and sometimes causes her to sleep for long periods of time, but she has not testified (yet) that she is unable to perform the activities that are "central" to most persons' daily lives.[24]

Further, Netterville is clearly not "substantially limited" in the major life activity of working. This is clearly established by the fact that she was able to perform her job for CPChem and has been gainfully employed for all but a few months since her termination from CPChem

---

[23] *See also Sherrod*, 132 F.3d at 1119-20 (plaintiff who could perform the normal activities of daily living despite her impairment was not "disabled"); *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726-27 (5th Cir. 1995) (plaintiff who could feed herself, drive, carry groceries, wash dishes, vacuum and perform other routine activities of daily life was not "disabled" in fact).

[24] The Fifth Circuit has found a plethora of more serious and debilitating medical conditions than Netterville's did not constitute "disabilities" under the ADA because they did not "substantially limit" any major life activity as a matter of law. *See, e.g., Waldrip*, 325 F.3d at 656 (plaintiff with chronic pancreatitis was not disabled as a matter of law because his pancreatitis did not cause "severe" impairment of any major life activity); *Blanks v. Southwestern Bell Commc'n, Inc.*, 310 F.3d 398,401 (5th Cir. 2002) (plaintiff with HIV not disabled as a matter of law); *Dupre*, 242 F.3d at 614-15 (plaintiff with degenerative back disease not disabled as a matter of law); *EEOC v. R.J. Gallagher Co.*, 181 F.3d 645, 653-55 (5th Cir. 1999) (plaintiff with blood cancer not disabled as a matter of law); *Talk v. Delta Airlines, Inc.*, 165 F.3d 1021, 1024-25 (5th Cir. 1999) (plaintiff with permanently flexed foot not disabled as a matter of law); *Hamilton v. Southwestern Bell Tel. Co.*, 136 F.3d 1047, 1050-51 (5th Cir. 1999) (plaintiff with post-traumatic stress disorder not disabled as a matter of law); *Sherrod*, 132 F.2d at 1119-20 (plaintiff with cervical neck fusion to neck not disabled as a matter of law); *Still v. Freeport-McMoran, Inc.*, 120 F.3d 50, 52 (5th Cir. 1997) (plaintiff with blindness in one eye not disabled as a matter of law); *Burch v. Coca-Cola Co.*, 119 F.3d 305, 314-17 (5th Cir. 1997) (alcoholic plaintiff not disabled as a matter of law); *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 805-06 (5th Cir. 1997) (plaintiff with pacemaker not disabled as a matter of law); *Robinson v. Global Marine Drilling Co.*, 101 F.3d 35, 37 (5th Cir. 1996) (plaintiff with asbestosis causing a 50% reduction in lung capacity not disabled as a matter of law); *Ray v. Glidden Co.*, 85 F.3d 227, 229 (5th Cir. 1996) (plaintiff with avascular necrosis not disabled as a matter of law); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 190-91 (5th Cir. 1996) (plaintiff with breast cancer not disabled as a matter of law)

13

almost four years ago.[25]  While she seems to contend that her termination by CPChem caused her condition to become more severe, she also concedes that she was back in the work force within approximately two months.  Further, the accommodation that Netterville sought – alternating typing and reading and taking naps at lunch – demonstrates that she was not substantially limited in the major life activity of working.

The summary judgment evidence is overwhelming; Netterville may have been impaired, but she was not substantially limited in any major life activity.

## 2.  CPChem Did Not "Regard" Netterville as Disabled

Where an employer regards a particular employee as having "such an impairment," 42 U.S.C. § 12102(2)(C), – that is, an impairment that substantially limits a major life activity – the employee is "disabled" within the meaning of the ADA.  *E.E.O.C. v. R.J. Gallagher Co.*, 181 F.3d 645, 656 (5th Cir. 1999).  An employer regards an employee as disabled when it "mistakenly believes that: (1) the person has a physical impairment that substantially limits one or more major life activities, or (2) an actual, nonlimiting impairment substantially limits one or more major life activities."  *Mason v. United Airlines, Inc.*, 274 F.3d 314, 317 (5th Cir. 2001), *citing*, *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 119 S. Ct. 2139, 2149-50 (1999).  In either situation, the employer must "entertain misperceptions about the individual – it must believe either that one has a substantially limiting impairment that one does not have or that one has a

---

[25] Factors to consider when determining whether someone is substantially limited in working include
(A) The geographical area to which the individual has reasonable access;
(B) The job from which the individual has been disqualified ..., and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or
(C) The job from which the individual has been disqualified ..., and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes). 29 C.F.R. § 1630.2(j)(3)(ii).

14

230315v1

substantially limiting impairment when, in fact, the impairment is not so limiting." *Sutton,* 119 S.Ct. at 2149-50.

Obviously, the EEOC must prove at trial, and on summary judgment must create a fact issue, that at the time CPChem terminated Netterville it regarded her as unable to perform any major life activity. *Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 475-476 (5th Cir. 2006). If the EEOC bases its "regarded as" claim on the major life activity of working, it must prove that CPChem believed that Netterville was "unable to work in a *broad class of jobs*," rather than just "one type of job, a specialized job, or a particular job of choice." *Sutton*, 119 S.Ct. 2151. As noted above, it clearly cannot achieve this because Netterville was obviously able to work and because all of the CPChem employees who were deposed testified that they did not consider Netterville "disabled."[26] In fact, Thurman testified that he *never even considered* whether Netterville's condition impaired her ability to do her job.

The EEOC's "regarded as" case is far weaker than "regarded as" cases the Fifth Circuit has historically rejected.[27] There is no reason for this case to be treated differently. Accordingly, CPChem's motion for summary judgment should be granted.

---

[26] There are no other major life activities at issue with respect to the "regarded as" issue. There is no evidence that any of the CPChem employees involved in this matter had any discussions with Netterville about other major life activities.

[27] *See, e.g. Waldrip*, 325 F.3d at 657 (affirming summary judgment even though the plaintiff's manager expressed concern about the plaintiff taking central nervous systems depressants for his medical problem while operating heavy machinery at work.); *Gowesky v. Singing River Hosp. Sys.,* 321 F.3d 503, 506 (5th Cir.), cert denied, 124 S. Ct. 66 (2003) (affirming summary judgment even though a manager said he would not let the hepatitis C infected plaintiff near his child); *Blanks,* 310 F.3d at 402 (affirming summary judgment even though a manager said that the plaintiff, "had a permanent disability that would never allow him to work as a customer service representative at Southwestern Bell."); *Deas v. River West, L.P.,* 152 F.3d 471, 481-82 (5th Cir. 1998) (affirming summary judgment even though the plaintiff's boss said her seizure disorder rendered her unable to do her job); *Ellison,* 85 F.3d at 192-93 (affirming summary judgment even through the plaintiff's boss said she should have a mastectomy for her breast cancer because her breasts were "not worth saving," and, when the lights went out in the building once, her boss laughed and said, "[D]on't worry about it. Follow Phyllis [the plaintiff]. See, look over there. She's glowing.").

15

230315v1

**B.    The EEOC's ADA Discrimination Claim Fails Because CPChem Terminated Netterville for a Legitimate Nondiscriminatory Reason That was not Pretextual**

**1.    The EEOC Cannot Meet the Overwhelming Legal Standard**

Even assuming *arguendo*, and solely for purposes of this Motion, that the EEOC could demonstrate that Netterville was disabled, to make its *prima facie* case it would still have to prove that Netterville was terminated ***because of*** her alleged disability. *Ivy v. Jones*, 192 F.3d 514, 516 (5th Cir. 1999). Because there is no "direct evidence" of discrimination in this case, the EEOC must make its proof by the well-known circumstantial evidence method used in employment discrimination cases.[28] *See Raytheon Co. v. Hernandez*, 124 S.Ct. 513, 517-18 (2003) (applying the *McDonnell Douglas/Burdine* model in ADA discrimination case).

Accordingly, if the EEOC establishes a *prima facie* case, the burden of production shifts to CPChem to articulate a legitimate, nondiscriminatory reason for Netterville's termination. *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 511 (5th Cir.), *cert. denied*, 124 S.Ct. 66 (2003); *Wallace v. Methodist Hosp.*, 271 F.3d 212, 219 (5th Cir. 2001). At that point, the burden reverts to the EEOC to produce evidence that CPChem intentionally discriminated against Netterville. *See, e.g., Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 146-48 (2000); *Bryan v. McKinsey & Co., Inc.*, 375 F.3d 358, 360 (5th Cir. 2004).

To meet this heavy burden, the EEOC "must produce substantial evidence of pretext." *Auguster v. Vermillion Parhis School Bd.*, 249 F.3d 400, 402-03 (5th Cir. 2001). Such evidence

---

[28] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255-56 (1981). As with the legal standard for summary judgment, this Court is well-versed with respect to the *McDonnell Douglas* framework and CPChem only briefly restates it here. This standard applies to both the EEOC's discriminatory discharge ADA claim and its retaliation claim. Accordingly, both claims are treated in this section.

16

230315v1

must rebut CPChem's articulated reason for Netterville's termination. *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 317 (5th Cir. 2004). This the EEOC cannot do.

### 2.   CPChem's Good Faith Belief, Whether Correct or Not, Whether Reasonable or Not, is Sufficient Basis for Summary Judgment

CPChem does not have to be correct in its belief that Netterville falsified the medical questionnaire; it only has to have acted in the absence of any discriminatory/retaliatory motive. *See Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir.1995) ("The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive.").

As the EEOC well knows, it is crystal clear in the Fifth Circuit that, lacking proof of intentional discrimination, it is inappropriate for federal courts to second-guess an employer's personnel decision-making. *EEOC v. Louisiana Office of Cmty. Servs.*, 47 F.3d 1446, 1448 (5th Cir. 1995) (the employment discrimination laws are "not intended to be a vehicle for judicial second-guessing of employment decisions nor . . . to transform the courts into personnel managers."). This principal holds true even where the employer is clearly mistaken. *Waggoner v. City of Garland, Tex.*, 987 F.2d 1160, 1165 (5th Cir. 1993) (holding plaintiff's summary judgment evidence of "innocence" irrelevant because plaintiff "must produce evidence demonstrating that [decision-maker] did not in good faith believe the allegations, but relied on them in a bad faith pretext to discriminate against him.").[29]

---

[29] *See also Price v. Federal Exp. Corp.*, 283 F.3d 715, 723-25 (5th Cir. 2002) (holding that even if the plaintiff proved that the employer's reason for the challenged employment action was pretextual, summary judgment against his claim was still proper because he failed to show that the employer was motivated by intentional discrimination); *Nawrot v. CPC Intern*, 277 F.3d 896, 906 (7th Cir. 2002) ("But pretext requires more than a showing that the decision was 'mistaken, ill considered or foolish, [and] so long as [the employer] honestly believed those reasons, pretext has not been shown.'") (citations omitted).

17

Further, it is axiomatic that a plaintiff's proof of pretext "must extend beyond casting doubt on the reasonableness of the employer's action; otherwise, the law would be converted to a 'just cause' provision for the protected class of employees, an effect that Congress clearly did not intend." *Hanchey v. Energas Co.*, 925 F.2d 96, 98 (5th Cir. 1990) (citation omitted). *See also Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 896 (5th Cir. 2002) ("[An employer] is entitled to be unreasonable so long as it does not act with discriminatory animus"), *cert. denied*, 123 S. Ct. 2572 (2003).

With these legal standards in mind, it is clear that CPChem terminated Netterville for a legitimate nondiscriminatory reason and that the EEOC cannot prove pretext.

### 3. The Bases for CPChem's Decision Are Irrefutable

The undisputed record evidence overwhelmingly demonstrates that CPChem terminated Netterville because it believed she falsified the post-offer medical questionnaire she completed on April 5, 2001. Falsification of employment documents is clearly a legitimate, nondiscriminatory reason for terminating an employee. *See Moore v. Eli Lilly & Co.*, 990 F.2d 812, 816 (5th Cir. 1993) (company's belief that employee falsified company records was legitimate nondiscriminatory reason for termination); *Avant v. South Cent. Bell Tel. Co.*, 716 F.2d 1083, 186-87 (5th Cir. 1983) (defendant articulated nondiscriminatory reason for not hiring plaintiff based on his falsification of employment application).

The following undisputed facts support CPChem's belief that Netterville falsified the post-offer questionnaire:

- On February 5, 2003, Netterville told Thurman that, though she had failed to inform CPChem of it, she was diagnosed with CFIDS "fifteen years ago," and that it had "resurfaced" "two years" ago.

18

- On February 26, 2003, Netterville confirmed the February 5 conversation during an investigatory interview with Rugeley and, when asked why she did not disclose information related to CFIDS on the questionnaire, responded to Rugeley that she did not think it would affect her job and thus decided not to disclose it.

- Upon his review of the questionnaire prior to Netterville's termination, the decision-maker, Borths, believed that she had falsely answered applicable questions – in particular the one that pertained to "excessive fatigue with work or exercise."

Subsequently developed evidence only demonstrates that CPChem was not mistaken:

- Netterville's medical records indicate that she checked a box for "fatigue," in response to questions about her past medical history in June 2001, just two months prior to her failure to disclose her fatigue in the post-offer questionnaire. This evidence utterly destroys the EEOC's effort to create a genuine and material issue of fact by suggesting that Netterville's CFIDS did not resurface until 2002.

- Netterville's testimony is contradictory – on the one hand she claims that she did not disclose CFIDS because she did not have it, on the other hand she claims that if the question about "excessive fatigue" were worded differently – if it had asked whether she was "tired all of the time" – she would have checked the "yes" box.[30]

CPChem informed Netterville that it terminated her for falsification of the medical questionnaire. It responded to her EEOC charge with a position statement that articulated the same reason for termination and highlighted Netterville's response to the questions regarding "excessive fatigue" and "blood disorders" as the basis for its belief, along with the information she provided to it when it investigated the matter. CPChem's employees and former employees all testified consistently regarding its basis for believing that Netterville falsified the questionnaire. There is not a hint of pretext in this case, much less a fact-issue.

---

[30] In other words, following Netterville's contorted logic, had the question been worded differently, she **would have disclosed a condition that she did not have**. Again, such "evidence" does not create a genuine and material issue of fact. *See e.g.*, *Copeland v. Wasserstein*, 278 F.3d 472, 482 (5th Cir. 2002) (no genuine issue of material fact where plaintiff's affidavit controverts her deposition testimony).

19

### 4.    The Timing of Netterville's Termination Does not Support the EEOC's Discrimination or Retaliation Claims[31]

Presumably, the EEOC will make the same argument it made in its ludicrous cause finding – that the timing of Netterville's termination somehow reveals that CPChem violated the ADA.  This argument blatantly ignores the facts.  It is *inescapable* that the timing of Netterville's termination would fall closely on the heels of her request for the reasonable accommodation of two weeks off to rest because of her CFIDS.  As discussed above, it was this discussion between Netterville and Thurman that alerted CPChem to the failure-to-disclose issue.  Consequently, it was this discussion that began CPChem's analysis and investigation of whether Netterville falsified the post-offer medical questionnaire.

Further, mere timing, without additional evidence, is insufficient as a matter of law to create a factual issue.  *See Swanson v. General Servs. Admin.,* 110 F.3d 1180, 1188 (5th Cir.1997) ("once the employer offers a legitimate, nondiscriminatory reason that explains both the adverse action and the timing, the plaintiff must offer some evidence from which the jury may infer that retaliation was the real motive").  Indeed, as noted in *Swanson,* statutory "protection against retaliation does not permit EEO complainants to disregard work rules or job requirements." *Id.* at n. 3.

The Fifth Circuit has shown no hesitation in affirming summary judgment when the adverse employment action occurred literally *moments* after the alleged protected activity, where the employer articulated a legitimate nondiscriminatory reason, as CPChem does here. *Seaman v. CSPH, Inc.,* 179 F.3d 297, 301 (5th Cir. 1999) (summary judgment was affirmed against

---

[31] CPChem addresses the *prima facie* retaliation case below.  For efficiency purposes, it addresses its legitimate nondiscriminatory reason for Netterville's termination with respect to both the discrimination and retaliation claims in this section.

20

employee who was terminated, for insubordination, moments after informing employer that he filed EEOC charge). Like Seaman, Netterville "may not use the ADA as an aegis and thus avoid accountability for [her] own actions." *Id.* at 301.

CPChem terminated Netterville for a legitimate, nondiscriminatory reason and the EEOC cannot create any issue of fact regarding pretext. Accordingly, summary judgment should be granted on its ADA claims.

**C.     The EEOC's Retaliation Case Fails Because Netterville Did Not Engage in Protected Activity and Because Her Termination was Legitimate (as Discussed Above)**

To prevail on its retaliation claim, the EEOC must show that (1) Netterville engaged in an activity protected under the ADA; (2) an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse employment action. *Seaman*, 179 F.3d at 301; 42 U.S.C. § 12203(a). Even if it makes such a prima facie showing, as noted above, CPChem prevails on this motion for summary judgment because it articulates a legitimate nondiscriminatory reason for Netterville's termination and the EEOC cannot raise a factual issue as to pretext. *Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 325-326 (5th Cir. 2002).

As demonstrated above, Lorin Netterville was not "disabled" under any definition in the ADA. Accordingly, she was not entitled to any reasonable accommodation, notwithstanding the fact that CPChem afforded her several. Because she was not entitled to any reasonable accommodation, it is impossible that she engaged in protected activity by seeking one. Indeed, the notion that an employee is *entitled* by ADA retaliation law to seek an accommodation to which *she is not entitled* under ADA discrimination law flies in the face of sound logic.

Cases that have rejected the idea that a "regarded as" plaintiff is entitled to a reasonable accommodation have done so for the common sense reason that someone who is not disabled

21

should not receive a reasonable accommodation. *See, e.g., Weber v. Strippit, Inc.*, 186 F.3d 907 (8th Cir. 1999) ("The ADA cannot reasonably have been intended to create a disparity in treatment among impaired but non-disabled employees, denying most the right to reasonable accommodations but granting to others, because of their employers' misperceptions, a right to reasonable accommodations no more limited than those afforded actually disabled employees."); *Workman v. Frito-Lay, Inc.*, 165 F.3d 460 (6th Cir. 1999).[32] It requires no great leap of logic to conclude that employees who are not entitled to a reasonable accommodation are likewise not engaging in protected activity when they seek one.

This Court should grant summary judgment on the EEOC's retaliation claim because Netterville never engaged in protected activity.[33] Failing that, this Court should grant summary judgment because CPChem terminated Netterville for a legitimate nondiscriminatory reason and the EEOC cannot prove pretext, as discussed in Section B above.

### D.    This is no Reasonable Accommodation Case[34]

#### 1.    Netterville was not Entitled to a Reasonable Accommodation

Recognizing the significant weaknesses in its disability/retaliation cases, the EEOC has attempted to manufacture a reasonable accommodation case, though none exists. This is nothing more than a diversionary tactic by the Commission, hoping to avoid the dispositive issue of Netterville's dishonesty.   An employer does not owe a reasonable accommodation to an

---

[32] There are cases that hold that a person who is not disabled, but in good faith seeks a reasonable accommodation, has engaged in protected activity. *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 190-191 (3d Cir. 2003). Bluntly stated, such cases are wrong. Their reasoning turns the ADA's retaliation provision into a potential lottery, giving a federal cause of action to plaintiffs for whom the ADA is clearly not intended, but who wrongly (even if in "good faith") believe they are entitled to a reasonable accommodation.

[33] Even Netterville cannot identify any conduct on her part that resulted in retaliation.

[34] There is no duty to accommodate in a "regarded as" case because a person who is regarded as disabled is not actually disabled and thus does not need an accommodation. *Workman v. Frito-Lay, Inc.*, 165 F.3d 460 (6th Cir. 1999); *Weber v. Strippit, Inc.*, 186 F.3d 907 (8th Cir. 1999).

22

employee it terminates for legitimate, nondiscriminatory reasons. *E.g., Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12 (1st Cir. 1997). Further, an employee who is not disabled is not entitled to a reasonable accommodation. *Weber v. Strippit, supra.* As a threshold matter, summary judgment should be granted on the EEOC's purported reasonable accommodation claim because there is no reasonable accommodation CPChem could have made for Netterville's dishonesty and because Netterville was not entitled to any accommodation since she was not "disabled."

### 2.  Even if Entitled, Netterville was Granted Every Accommodation she Requested

"In general . . . it is the responsibility of the individual with the disability to inform the employer that an accommodation is needed." 29 C.F.R. § 1630.9, App. (1995). Thus, the employee's initial request for an accommodation triggers the employer's obligation to participate in the interactive process. *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5th Cir.), *cert. denied*, 519 U.S. 1029, 117 S. Ct. 586, 136 L.Ed.2d 515 (1996).

Though reassignment may be a reasonable accommodation in some instances where a vacancy exists, an employer is not required to create a position for an employee as a reasonable accommodation. *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 809 (5th Cir. 1997) (holding that "[f]or the accommodation of a reassignment to be reasonable, it is clear that a position must first exist and be vacant. Under ADA, an employer is not required to give what it does not have."). Additionally, the ADA does not vest the employee with the ability to unilaterally demand an accommodation; an employer is free to offer a different accommodation that permits an employee to perform the essential functions of her job. *See* 29 C.F.R. § 1630.9; *Richards v. Seariver Maritime Fin. Holdings, Inc.*, 59 F. Supp. 2d 616, 630 (S.D. Tex. 1998).

23

Here, Netterville requested two weeks off to rest, which the EEOC now presumably argues was a request for a reasonable accommodation. Thurman immediately granted her request. Next, Netterville brought a terse note from her physician that stated only that she was "released to work at a substation closer to home." Netterville claims that Thurman told her that CPChem could not accept that release. Netterville admits that she did not tell Thurman that she needed to work closer to home because of her medical condition or as a "reasonable accommodation." Indeed, Netterville admits that no one at CPChem had any reason to believe that she needed to work closer to home due to her impairment.

Further, the physician's letter does not indicate any medical reason why Netterville would need to work closer to home. Additionally, Rugeley and Thurman were not sure what a "substation" was and Netterville never made any effort to tell them.[35] As a matter of law, this purported request for an accommodation is insufficient. *Gammage v. West Jasper Sch. Bd. of Educ.*, 179 F.3d 952, 955 (5th Cir. 1999) (employee requesting an accommodation must assert not only a disability, but also any limitation resulting therefrom).

Perhaps more to the point, however, even had CPChem recognized the "substation closer to home" letter as a request for a reasonable accommodation, it is undisputed that no position was available at CPChem's Pasadena Plant. The group for which Netterville worked, Specialty Chemicals, did not have a presence at that location. Further, there were no administrative assistant positions at that location. Accordingly, CPChem would not have been obligated to transfer Netterville to its Pasadena Plant. *Blanks*, 310 F.3d at 402.

---

[35] Though Netterville admits that she had not heard the term "substation" used to describe CPChem's plants, if she is to be believed, she knew what the term meant. That she chose not to share such information is puzzling.

24

Netterville returned to her physician and presented CPChem with another letter that specifically sought the "reasonable accommodation" of Netterville alternating her typing and reading and taking naps at lunch.    Thurman, Netterville's supervisor, implemented these accommodations upon her return to work on February 20.    Thus, those accommodations Netterville sought were granted.  She simply failed to uphold her part of the interactive process with respect to the purported "substation" accommodation.  Clearly, this Court should grant CPChem's motion for summary judgment on this claim as well.

## CONCLUSION

For all of the foregoing reasons, Defendant Chevron Phillips Chemical Company, LP, respectfully requests that this Court grant this Motion for Summary Judgment and dismiss all of the EEOC's claims against it.  CPChem also requests such other relief to which it may show itself justly entitled, including its reasonable attorneys' fees and costs.

Respectfully submitted,

By: */s/Scott R. McLaughlin*
    SCOTT R. MCLAUGHLIN
    State Bar No. 00791234
    SD TX ID No. 18138
    SHOOK, HARDY & BACON L.L.P.
    600 Travis, Suite 1600
    Houston, TX  77002-2911
    Telephone:    713/227-8008
    Telefax:    713-227-9508
    E-Mail:    smclaughlin@shb.com

    ATTORNEYS FOR DEFENDANT, CHEVRON
    PHILLIPS CHEMICAL COMPANY, LP

25

OF COUNSEL:

MARLENE WILLIAMS
State Bar No. 24001872
SD TX ID No. 22824
E-Mail:        mwilliams@shb.com
MARNI MAGOWAN OTJEN
State Bar No. 24046568
SD TX ID No. 567838
E-Mail:        motjen@shb.com
SHOOK, HARDY & BACON, L.L.P.
600 Travis Suite 1600
Houston, TX   77002-2911
Telephone:     713/227-8008
Telefax:       713-227-9508

## CERTIFICATE OF SERVICE

This will certify that a true and correct copy of Defendant Chevron Phillips Chemical Co. LP's Motion for Summary Judgment was served on counsel of record via email at rudy.sustaita@eeoc.gov, and counsel was also copied per the efiling procedures of the United States District Courts, Southern District of Texas, this 1st day of December, 2006.

                    _/s/Scott R. McLaughlin_____
                    SCOTT R. MCLAUGHLIN

26

230315v1