06-E-88096 sh

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES EQUAL EMPLOYMENT ) | | |
| OPPORTUNITY COMMISSION, ) | | |
| ) | | |
| Plaintiff, ) | CIVIL ACTION | |
| ) | NO. H-05 3377 | |
| v. ) | | |
| ) | | |
| CHEVRON PHILLIPS CHEM. CO., ) | | |
| LP, ) | | |
| ) | | |
| Defendant. ) | | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

LORIN D. NETTERVILLE

October 10, 2006

Volume 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION of LORIN D. NETTERVILLE, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 10th of October, 2006, from 10:16 a.m. to 3:54 p.m., before Shanon M. Hair, CSR in and for the State of Texas, reported by machine shorthand, at the offices of the United States Equal Employment Opportunity Commission, 1919 Smith Street, 7th Floor, Houston, Texas 77002, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

EXHIBIT 1

Lorin D. Netterville                                                              October 10, 2006

**Page 2**

INDEX
Appearances..........................................................4
LORIN D. NETTERVILLE
    Examination by Mr. McLaughlin.....................5
    Examination by Mr. Sustaita........................176
Signature and Changes.......................................187
Reporter's Certificate.........................................189

EXHIBITS
NO.  DESCRIPTION                                    PAGE
1..............................................................................44
    Resume
2..............................................................................46
    Employment Application
3..............................................................................57
    04-26-02 memo to Gary Thurman from Lorin
    Netterville
4..............................................................................82
    CFIDS printout
5..............................................................................82
    CFIDS printout
6..............................................................................87
    02-04-03 letter to Whom it May Concern from
    Patricia D. Salvato, M.D.
7..............................................................................93
    Employee Request for Information
8............................................................................112
    Performance Appraisal
9............................................................................127
    02-18-03 letter to Whom it May Concern from
    Patricia D. Salvato, M.D.
10..........................................................................128
    02-20-03 letter to Whom it May Concern from
    Patricia D. Salvato, M.D.
11..........................................................................137
    Medical History

**Page 3**

INDEX
(Continued.)

EXHIBITS
NO.  DESCRIPTION                                    PAGE
12..........................................................................153
    Charge of Discrimination
13..........................................................................165
    Charge Information Form

**Page 4**

APPEARANCES
FOR THE PLAINTIFF:
    Rudy L. Sustaita, Esq.
    UNITED STATES
    EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
    1919 Smith Street, 7th Floor
    Houston, Texas 77002
    (713) 209-3400, fax (713) 209-3402
    rudy.sustaita@eeoc.gov
FOR THE DEFENDANT:
    Scott R. McLaughlin, Esq.
    SHOOK, HARDY & BACON L.L.P.
    JPMorgan Chase Tower
    600 Travis Street, Suite 1600
    Houston, Texas 77002-2911
    (713) 227-8008, fax (713) 227-9508

    -and-

    Theresa Kennedy, Esq.
    CHEVRON PHILLIPS CHEMICAL COMPANY LP
    10001 Six Pines Drive
    The Woodlands, Texas 77380

**Page 5**

1    (10:16 a.m.)
2    LORIN D. NETTERVILLE,
3  having been first duly sworn, testified as follows:
4    EXAMINATION
5  BY MR. McLAUGHLIN:
6    Q.  Ms. Netterville, my name is Scott McLaughlin, I
7  represent Chevron Phillips Chemical Company in a lawsuit
8  that the EEOC has filed against it. Are you aware of that?
9    A.  I am.
10   Q.  Okay. We've never met before have we, ma'am?
11   A.  No.
12    MR. McLAUGHLIN: And someone's knocking at
13  the door.
14    (Discussion off the record at 10:17 a.m.)
15   Q.  (BY MR. McLAUGHLIN) Are you on any medication
16  today, Ms. Netterville, that may affect your ability to
17  recall events of the past?
18   A.  I'm on pain medication.
19   Q.  Okay. Do you have any reason to think that that
20  could affect your memory?
21   A.  Not usually.
22   Q.  But sometimes?
23   A.  Well, I can't say 100 percent it won't, but I --
24  you know.
25   Q.  All right.

Page 6

1   A.  I haven't had that problem before. But just so
2   you know, I am on pain medication.
3   Q.  All right. Have you ever given a deposition
4   before?
5   A.  I have not.
6   Q.  All right. Have you ever given any sworn
7   testimony before?
8   A.  Yeah.
9   Q.  In what sort of proceeding?
10  A.  A divorce proceeding.
11  Q.  Were you in court when you gave that testimony?
12  A.  No. I was in, like, a side room. There was a
13  magistrate. Is that what they're called? It wasn't the
14  judge. It was the judge's helper-type person --
15  Q.  Right.
16  A.  -- who was doing the questioning.
17  Q.  Do you recall -- I'm sorry. Do you recall giving
18  the oath like you did earlier today --
19  A.  Uh-huh.
20  Q.  -- and actually question and answer stuff?
21  A.  I did.
22  Q.  Besides that, have you ever given any sworn
23  testimony?
24  A.  Well, let's see. I divorced the same guy twice.
25  So, I guess both times I would have had to give sworn

Page 7

1   testimony --
2   Q.  Okay. But --
3   A.  -- but I can't think of any other.
4   Q.  All right. Now, as far as the deposition goes,
5   what we're doing today, you understand that today I'm going
6   to ask you some questions that you're going to answer to the
7   best of your ability. The court reporter to your right is
8   recording our questions and answers. Do you understand
9   that?
10  A.  Right, uh-huh. I understand.
11  Q.  All right. And the transcript that is created by
12  this deposition may or may not be used at the trial of this
13  matter, as well as other areas of this matter. Do you
14  understand that?
15  A.  Oh, okay.
16  Q.  Okay. I'm telling you that just to remind you
17  that you are under oath. Your testimony today could be
18  used --
19  A.  I understand.
20  Q.  -- in court, okay?
21  A.  I understand.
22  Q.  That's the reason I asked you earlier about your
23  memory --
24  A.  Okay. Right.
25  Q.  -- and whether the medication might affect your

Page 8

1   memory.
2   A.  Right. And as far as I know, it won't.
3   Q.  All right.
4   A.  I've never had it do it before.
5   Q.  Well, no physician has ever told you, I take it,
6   that the medication might affect your memory, right?
7   A.  No, they haven't.
8   Q.  Now, a little bit about the process today. I'm
9   going to ask questions. You're going to try to answer. If
10  I ask a question you don't understand, instead of trying to
11  answer it, just tell me to do a better job, okay?
12  A.  Okay.
13  Q.  Because I guarantee you there will be a point in
14  time today, probably more than one, where I'll ask a
15  question that I don't understand.
16  A.  Okay.
17  Q.  And, rather, than you try to answer something
18  that's unintelligible, better for you to tell me to clarify
19  my question, okay?
20  A.  Uh-huh.
21  Q.  The other thing is try to articulate answers
22  instead of an "uh-huh" or "huh-uh," nod of the head, that
23  type of thing. The reason for that is the court reporter on
24  your right has an easier time if she just takes down a "yes"
25  or a "no" or whatever the case may be, as opposed to a nod

Page 9

1   of the head or a shake of the head, okay?
2   A.  All right.
3   Q.  If you need a break today, all you need to do is
4   let me know that, okay?
5   A.  Okay.
6   Q.  This is not any kind of marathon to see how long
7   you can sit there and answer questions.
8   A.  That's good.
9   Q.  The only caveat I have for that is that if I've
10  asked you a question, I prefer that you try to answer it
11  before we take a break.
12  A.  Okay.
13  Q.  Now, again, if you just absolutely have to have a
14  break, even with a question pending, all you have to do is
15  tell me that and we can take a break, okay?
16  A.  All right.
17  Q.  Other thing is lunches and things like that I'm
18  flexible with. So, if there's a period of time you need to
19  stop and have a lunch, just let me know, all right?
20  A.  All right.
21  Q.  Okay.
22      MR. SUSTAITA: Is now a good time?
23      MR. McLAUGHLIN: Yeah. It's always a good
24  time to eat in my book.
25  Q.  (BY MR. McLAUGHLIN) Ms. Netterville, are you

Lorin D. Netterville                                                October 10, 2006

### Page 10

1  currently employed?
2  A.  I am.
3  Q.  With whom?
4  A.  I'm actually through a
5  PEO company. The PEO company is Odyssey One Source and
6  hires, of course, Odyssey One Source to do
7  all their HR. We even get our paychecks through Odyssey One
8  Source and everything.
9  Q.  What do you do for -- I understand what you said
10 about the PEO. I'll probably just ask you about what you do
11 for Equest Management and all that.
12 A.  Okay.
13 Q.  What is your position with Equest?
14 A.  Administrative assistant.
15 Q.  Okay. How long have you been in that position?
16 A.  Two-and-a-half years.
17 Q.  What's your rate of pay?
18 A.  29,000.
19 Q.  All right. You are hourly, correct, or
20 incorrect?
21 A.  Yes. 13.94 an hour.
22 Q.  All right. What did your rate of pay start at
23 when you first started doing the job with Equest?
24 A.  Well, I started as a -- with an agency. I
25 believe that it was $11 an hour.

### Page 11

1  Q.  And that -- but that -- when you say you started
2  with an agency, that was -- again, you were actually working
3  at Equest?
4  A.  Right. That was my assignment. They posted me
5  to       . It was through Office Team.
6  Q.  Okay. How did you go from Office Team to Odyssey
7  One Source?
8  A.  Because when I first went to       , they were
9  Retirement Living Management, the -- when I was first
10 posted, okay? Right after I went -- within a month after
11 going to Retirement Living Management,       had --
12 Retirement Living -- see if I get this right. They filed
13 for bankruptcy and       was formed and they then did all
14 of their HR stuff through Odyssey One Source.
15 Q.  Okay. To whom do you report?
16 A.  David Clement.
17 Q.  And with whom does he work, Equest or Odyssey?
18 A.  He -- all employees -- even the president is
19 Odyssey One Source PEO.
20 Q.  Okay.
21 A.  We're leased employees.
22 Q.  So, what is his position?
23 A.  CFO.
24 Q.  CFO?
25 A.  Uh-huh.

### Page 12

1  Q.  Now, you said you worked there approximately
2  two-and-a-half years.
3  A.  Uh-huh.
4  Q.  Any interruptions for that two-and-a-half or --
5  A.  No. And I included within that two-and-a-half
6  years the time I was with the -- the agency.
7  Q.  Correct. Understood. Prior to that, where did
8  you work?
9  A.  Well, let's see. I was off maybe a month from
10 work. Before that, I was working for   
11              , slash -- I mean, they had, like, six or
12 seven LLC names. It depended on what was going on as to
13 which company I was working for. They -- they leased
14 space -- their main thing was leasing space and storefront
15 properties.
16 Q.  Okay. Where is that business located?
17 A.  On Beamer in Houston, right across from San
18 Jacinto College South.
19 Q.  All right.
20 A.  I don't know the address.
21 Q.  Okay. That's fine.
22 A.  I know the phone number.
23 Q.  How -- that's okay. How long did you work there?
24 A.  Six months.
25 Q.  Okay. Prior to that, where did you work?

### Page 13

1  A.  Okay. I was off again for almost two months
2  because it was the first of August to the end of September.
3  And before that, it was a temporary position with       
4  Q.  All right.       a staffing company?
5  A.  Right. It was a temporary position, and I --
6  Q.  Where did       place you?
7  A.  I can't remember the name of the place. They did
8  remedial -- safety remedial work, like --
9  Q.  Okay.
10 A.  -- redoing the dirt and, you know, that --
11 Q.  Uh-huh.
12 A.  -- that kind of thing.
13 Q.  What did you do for that company?
14 A.  Mainly, I put together the reports that the guys
15 that went out in the field and -- and found out what was
16 wrong that needed to be remediated, put those reports
17 together.
18 Q.  Okay. All right. Prior to that, prior to the
19 Spherion position?
20 A.  Well, let's see. That was in April of -- at the
21 end of April and I had been off work since Chevron/Phillips.
22 Q.  Okay. So, you're saying you started the Spherion
23 position at the end of April of 2003?
24 A.  That's right.
25 Q.  And how long did you work the Spherion position?

Lorin D. Netterville                                                                                          October 10, 2006

Page 14

1  A. Three-months.
2  Q. All right. Which would bring you to the -- what
3  did you call it,        ?
4  A. Uh-huh.
5  Q.                       ?
6  A. Uh-huh.
7  Q. When did you --
8  A.           I'm sorry.
9  Q.           Sorry. I was thinking of the movie
10 probably.
11 A. The end of September.
12 Q. Okay. You said you started the         position
13 the end of April.
14 A. Uh-huh.
15 Q. So, we have May, June, July, approximately that
16 you worked       ?
17 A. Right. And right at the first of August, the
18 position -- they -- they closed that position down.
19 Q. Okay. And you began              when?
20 A. At the end of September.
21 Q. All right. What did you do in between?
22 A. Laid in bed.
23 Q. All right. And I take it that when you say that,
24 you're referring to your chronic fatigue syndrome?
25 A. Yeah. I was depressed.

Page 15

1  Q. Well, was it because of chronic fatigue syndrome
2  that you laid in bed or because you were depressed?
3  A. I'm sure it -- it was both probably.
4  Q. Did you ever get any kind of medical input on the
5  reason you laid in bed for that period of time?
6  A. No. I went to the doctor. I told her about it.
7  Q. Which doctor, Salvato?
8  A. Dr. Salvato.
9  Q. Okay. Am I correct -- is that a correct
10 characterization then, that from approximately the first of
11 August through the end of September you laid in bed?
12 A. Yeah.
13 Q. Is that overstating it at all?
14 A. No.
15 Q. Did you ever get up and do anything?
16 A. No.
17 Q. I mean, besides --
18 A. Yeah. No. That would -- that would be -- I
19 remember my sister coming in, saying, "Why don't you get out
20 of bed. Why don't you" --
21 Q. All right. Do you live with your sister?
22 A. I do.
23 Q. Who else do you live with, if anyone?
24 A. No one.
25 Q. All right.

Page 16

1  A. Oh, my dogs.
2  Q. All right. How many you got?
3  A. Four. No. One recently died.
4  Q. I'm sorry. What kind of dogs?
5  A. Have two Beagle mixes and one Basenji.
6  Q. What's that?
7  A. Basenji is an Egyptian dog.
8  Q. Okay.
9  A. And they don't bark. They yodel.
10 Q. Like a country singer, huh?
11 A. Uh-huh.
12 Q. All right. That would be interesting. So, you
13 began -- how did you find the       position, I guess,
14 is a better question?
15 A. My sister -- my other sister, not the one I live
16 with. I have another sister.
17 Q. Okay.
18 A. -- called me and said, "Loren, there's a position
19 in the paper. It's around the corner from you. You can do
20 this. Come on. Go apply for it."
21 Q. How long did you work at              ?
22 A. Six months.
23 Q. Six months. So, approximately through March of
24 2004?
25 A. Uh-huh.

Page 17

1  Q. Okay. Why did you leave the        position?
2  A. Didn't like it, didn't like what they did, didn't
3  like their ethics, didn't like -- always asked to do things
4  that I felt were legal -- illegal and morally wrong.
5  Q. What sort of things?
6  A. Things like report a son's earnings on his
7  mother's 1099. Things like tell vendors that Jay never
8  agreed to something. He would tell me to get three bids for
9  something. I was to take the lowest. I showed them to Jay
10 and then he would tell the vendor, "She never showed me
11 that. I would have never agreed to paying that much," you
12 know.
13 Q. Who's Jay, the owner?
14 A. The owner.
15 Q. What's his name, Jay what?
16 A. Jay Jabadi.
17 Q. Do you know how to spell that?
18 A. J-a-b-a-d-i.
19 Q. Okay.
20 A. It's actually Muhammad and -- it's the middle
21 initial J., but we always called him Jay.
22 Q. Got it. All right. What rate of pay did you
23 earn that the job?
24 A. $2100 a month.
25 Q. Okay.

**Page 18**

1    A.   And I -- I don't know -- I never did the
2    breakdown on it.
3    Q.   Okay. When you say that you don't know, the
4    hourly?
5    A.   Right. That's what I mean.
6    Q.   So, was that a 40-hour a week job?
7    A.   Uh-huh.
8    Q.   Okay. Now, how long between          and --
9    well,        I'll just call it
10   A.   Yeah. Almost a month-and-a-half because by the
11   end of April, I was working the -- like, April 28th, April
12   29th I went to work for
13   Q.   That would be April 28, '04?
14   A.   Uh-huh.
15   Q.   Okay. What did you do between          and
16
17   A.   Looked for a job, but mostly I was in bed.
18   Q.   So, for about a -- well, was it about a month
19   between the two or longer than that? We didn't really pin
20   down a date in March.
21   A.   Yeah. I think it was probably right at a month.
22   Q.   Okay. Are you saying that you looked for a job
23   but that you also spent a lot of time in bed?
24   A.   Uh-huh.
25   Q.   And the time in bed, what was that from or what

**Page 19**

1    was that because of?
2    A.   Probably more depression than anything else. I
3    felt pretty worthless.
4    Q.   Did you see Dr. Salvato at that time?
5    A.   I don't know. I could have because I saw her --
6    you know, because of my high blood pressure, I see her every
7    three months --
8    Q.   Uh-huh.
9    A.   -- and --
10   Q.   Did you -- well, back to the other time that you
11   talked about when you laid in bed between
12         for that period, did you go see Dr. Salvato
13   specifically for depression or what have you?
14   A.   I'm not sure if I did or not.
15   Q.   Okay.
16   A.   It -- I would have to look at her records.
17   Q.   All right.
18   A.   I know that I saw her during that time.
19   Q.   Right. Understood. But it could have been a
20   regularly scheduled visit. That's what you're saying?
21   A.   That's right, but I also know that without
22   insurance, her doctor visits were, like, $160, which I
23   didn't have, so I know I had to cancel some also.
24   Q.   Okay. You don't have any of Dr. Salvato's
25   records, do you?

**Page 20**

1    A.   No.
2    Q.   Okay. You don't have any records of your medical
3    visits, correct, or incorrect?
4    A.   No -- that's correct. I don't have anything.
5    Q.   Okay. Did you review any documents to prepare
6    for your deposition today?
7    A.   I did.
8    Q.   What did you look at?
9    A.   About 4 inches of --
10   Q.   Big stack of stuff?
11   A.   Yeah.
12   Q.   What sort of things were in the stack that you
13   recall?
14   A.   My medical history that I filled out, the charges
15   that I filled out --
16   Q.   Okay.
17   A.   -- e-mails between Mr. Thurman and the other
18   directors and vice presidents in our department and the
19   salespeople.
20   Q.   Do you know if the documents you looked at were
21   documents produced by Chevron Phillips to the EEOC, some of
22   them anyhow?
23   A.   I guess they were.
24   Q.   Okay. Do you know if some of them were documents
25   that the EEOC produced to Chevron Phillips?

**Page 21**

1         MR. SUSTAITA: I'll make a representation
2    that it's the disclosures.
3         MR. McLAUGHLIN: Okay. The documents we've
4    exchanged between -- okay. That's all I wanted.
5    A.   Yeah.
6    Q.   (BY MR. McLAUGHLIN) Did you look at any
7    documents beyond the documents that Mr. Sustaita just
8    referenced that were produced by either side in this
9    litigation?
10   A.   All I looked at is what he gave me.
11   Q.   Okay. Very good. Do you have any documents at
12   home that have anything to do with the case?
13   A.   No.
14   Q.   Do you have a home computer?
15   A.   Yes.
16   Q.   Do you have any documents on that computer that
17   have anything to with the case?
18   A.   Well, it's a fairly new computer. I got it well
19   after this and so, no, it wouldn't --
20   Q.   All right. During the time you were working at
21   Chevron Phillips, did you keep any kind of journal or diary
22   or anything like that that would include anything to do with
23   the work?
24   A.   I kept journals regularly, you know -- well, not
25   regularly, but off and on, but -- and I went back looking --

Page 22

1   Q.  Okay.
2   A.  -- and I didn't see anything that pertained
3   specifically to Chevron Phillips.
4   Q.  Did you see anything that pertained to your
5   termination by Chevron Phillips or the period right after
6   that?
7   A.  No. There's a -- no, huh-uh.
8   Q.  There's a what?
9   A.  Well, there -- I think I have a couple that's
10  missing, I can't find.
11  Q.  Couple of diaries, you mean?
12  A.  Right. I --
13  Q.  Okay.
14  A.  But I don't know that they have anything in them.
15  Q.  Okay.
16  A.  I don't remember writing at all at that time. I
17  was pretty depressed and was pretty much not doing anything.
18  Q.  Okay. When I asked you -- when I asked you what
19  you did between Silk Road and Equest, that month period, you
20  said you looked for a job and that you were also -- you
21  spent some time in bed.
22  A.  Uh-huh.
23  Q.  You said that was probably more from
24  depression --
25  A.  Uh-huh.

Page 23

1   Q.  -- than anything else. At that point in time,
2   the depression you're talking about, what do you attribute
3   that to?
4   A.  To the firing.
5   Q.  Okay.
6   A.  It took me a long time to get over it. I was --
7   Q.  How long did it take you get over it?
8   A.  Two, three years.
9   Q.  Okay.
10  A.  I mean, I still have problems. To interview now
11  is almost a -- I'd just as soon stick my tongue to a frozen
12  post.
13  Q.  Have a hard time finding a frozen post around
14  here, you'd think.
15  A.  I know. I just think about that --
16  Q.  Movie?
17  A.  Christmas Story.
18  Q.  I'm with you.
19  A.  I feel -- it's very hard for me to believe in the
20  people that I work for, period.
21  Q.  And have you -- go ahead.
22  A.  No. I just don't trust them.
23  Q.  You don't trust the people you work for?
24  A.  Any of them, any of them since then.
25  Q.  Okay. Have you experienced depression prior to

Page 24

1   the time you worked at Chevron Phillips?
2   A.  Some.
3   Q.  On and off? Is that -- when you say "some," I'm
4   just --
5   A.  Some, yeah. Going through the divorce --
6   Q.  Uh-huh.
7   A.  -- divorces were pretty tough. They were --
8   yeah, they were pretty tough and I did then, but it wasn't a
9   regular thing that I just was depressed all the time. It
10  was specific to --
11  Q.  Okay.
12  A.  -- the -- the divorce and --
13  Q.  What was the approximate -- what are the
14  approximate years of the divorces?
15  A.  The first one -- okay. Let me see if I can even
16  remember. First one was -- Tim was seven months old. That
17  would have been 1980 -- '81, '82 -- maybe '83, the first
18  one.
19  Q.  Okay. What about the second one?
20  A.  Second one drug on from 1990 to 1993.
21  Q.  The divorce did?
22  A.  Yes.
23  Q.  You mentioned earlier this is the same guy.
24  A.  Uh-huh.
25  Q.  What's his name?

Page 25

1   A.
2   Q.  In total, how long were you guys married,
3   counting both marriages?
4   A.  Sixteen years.
5   Q.  All right. How long for the first one?
6   A.  Ten.
7   Q.  Okay. Why did you guys get divorced? I guess
8   that's -- I guess there were two divorces.
9   A.  Yeah.
10  Q.  Was the reason the same both times?
11  A.  Yeah, his drinking and doing drugs and --
12  Q.  Okay.
13  A.  -- deciding that a wall was a good thing for me
14  to go through.
15  Q.  So, he physically abused you during the marriage?
16  A.  He physically abused me, he mentally abused me,
17  yes.
18  Q.  All right.
19  A.  But the kicker was when I found him smoking pot
20  with my oldest son.
21  Q.  Was that the first one or the second one,
22  divorce?
23  A.  Second one.
24  Q.  All right.
25  A.  Yeah.

**Page 26**

1  Q. Did you ever bring criminal charges against him
2  for abuse or anything like that?
3  A. No, no. I --         went to a drug rehab though.
4  Q. That's your older son?
5  A. Uh-huh.
6  Q. Is there any sort of record of his -- of Terry
7  Lunsford's abuse towards you?
8  A. No. I didn't ever go to the police or anything
9  like that, no.
10 Q. Okay. Is it contained in the divorce records at
11 all? In other words, did you ever give testimony or an
12 affidavit or something talking about his abuse?
13 A. I know that I talked about it with my lawyer, but
14 I also know that no-fault divorce was --
15 Q. Right.
16 A. -- such the thing that they didn't really --
17 Q. Right. Nobody really cared why.
18 A. Right.
19 Q. Understood. Who was your lawyer for -- was it
20 the same for both?
21 A. No.
22 Q. Okay. Who was it for the first one, do you
23 remember?
24 A. No.
25 Q. Okay. How about the second one?

**Page 27**

1  A. Catherine Gassner, Glassner, something like that.
2  Q. Okay. She located in the Pasadena area or --
3  A. No. Downtown.
4  Q. Downtown?
5  A. Uh-huh.
6  Q. Does she have a firm, do you remember?
7  A. I think so, but I don't know what it is. I know
8  she was on Caroline Street.
9  Q. Okay. When you said -- I think you said your
10 older son went to rehab,
11 A. Uh-huh.
12 Q. Did that work?
13 A. Uh-huh.
14 Q. Okay. Good. Did he go to rehab particularly for
15 any specific type of addiction or a bunch of different ones
16 or what?
17 A. I think what they determined is it was alcohol.
18 Q. Alcohol abuse?
19 A. Uh-huh.
20 Q. Okay. But he had -- I take it he had a -- drug
21 issue as well, or not?
22 A. Well, all I know is that I caught that one time.
23 Q. Uh-huh.
24 A. I don't know if he regularly smoked marijuana or
25 not.

**Page 28**

1  Q. How is it that he came to be sent to rehab or
2  whatever? Did --
3  A.         took him.        took him saying that I
4  knew the alcohol abuse was going on. It was when he was
5  trying to get --
6  Q. It was during the divorce?
7  A. Right. He was trying to get custody.
8  Q. All right. How old was your son when he went to
9  rehab?
10 A. 14 or 15.
11 Q. All right. Okay. How many sons do you have or
12 how many -- I'm thinking sons because my wife's pregnant
13 with my third son, so daughters in my family don't happen
14 apparently.
15    How many children do you have?
16 A. I have five, three living.
17 Q. Oh, I'm sorry. Are you saying that you had two
18 other children who passed away?
19 A. Yeah. It's something I'd rather not discuss.
20 Q. All right. Let me -- let me avoid discussing
21 details at the moment and see if I can try to do that
22 throughout.
23 A. Okay.
24 Q. But is it -- is it accurate that -- you said
25 five, three living. Is it accurate that whatever the

**Page 29**

1  situation is with regard to the other two has caused you
2  grief?
3  A. Yes.
4  Q. Now, have you experienced any depression over
5  that? And, again, I'm avoiding the situation --
6  A. Yeah.
7  Q. -- all of that, but have you experienced
8  depression due to that?
9  A. I did. I did for a while.
10 Q. For how long of a while? And, again, I'm
11 avoiding dates. I'm avoiding getting real specific, you
12 know.
13 A. I don't know. Maybe three or four years.
14 Q. All right. Okay.
15 A. It wasn't deep, black pit depression. It was
16 just, you know, a lot of grieving.
17     MR. SUSTAITA: Take just a tiny break?
18     MR. McLAUGHLIN: Yeah, sure.
19     (Recess from 10:44 a.m. to 10:46 a.m.)
20 Q. (BY MR. McLAUGHLIN) Mrs. Netterville, do you
21 need to add anything to your testimony?
22 A. Yes. The two children were aborted --
23 Q. I -- understood.
24 A. -- okay? And I just -- I grieved for them and
25 hurt for them until I named them.

Lorin D. Netterville                                                                October 10, 2006

Page 30

1   Q.   Okay.
2   A.   And once I accepted that -- that, then --
3   Q.   Understood. I actually -- I was actually on the
4   same page with you, but I didn't -- if you don't want to
5   talk about it -- look, through this process, I will have to
6   ask you some questions that are unpleasant. I won't
7   necessarily want to ask them, you may not want to answer
8   them. It is unfortunately part of the process. What I can
9   tell you is I will avoid, you know, upsetting you, to the
10  extent I can, I will avoid getting into things if at all
11  possible. I'm not here, you know, to see how upset you can
12  get or anything like that, all right? I will try to respect
13  your wishes in that regard. If I cannot, I will tell you
14  that I cannot and I will tell you that I have to proceed,
15  okay?
16  A.   Okay.
17  Q.   All right. You said it wasn't the black pit of
18  depression or something like that. Have you experienced the
19  black pit of depression?
20  A.   Yeah.
21  Q.   More than once?
22  A.   Yeah.
23  Q.   With regard to what?
24  A.   One was a personal issue that -- just a personal
25  issue when my son almost died, my youngest son almost died.

Page 31

1   Q.   Okay. What else?
2   A.   And the other -- and it -- the other was -- and I
3   know it's -- when I was fired, I felt like I was -- I just
4   felt like I was worthless and -- I just did.
5   Q.   Okay. Is it the case then that the two worst
6   episodes of depression in your life are when your youngest
7   son almost died and when you were fired?
8   A.   Yes, because I felt like I could never -- that I
9   would never -- it took me a while to understand that I would
10  be able to work again. By this time, I was by myself
11  basically.
12  Q.   What do you mean by that?
13  A.   I mean, I didn't -- my boys were gone --
14  Q.   Okay.
15  A.   -- you know, and I was afraid of not being able
16  to support myself.
17  Q.   All right. Back to your -- just backing up a
18  minute, the journal you mentioned, do you -- in that
19  journal, do you record information that pertains to your
20  chronic fatigue immune deficiency syndrome?
21  A.   I may have.
22  Q.   Okay.
23  A.   It's been a while since I journaled, but I may
24  have things about it.
25  Q.   When you say it's been a while since you

Page 32

1   journaled, how long has it been?
2   A.   I know I haven't in this year. Maybe a year,
3   maybe a year and a half.
4   Q.   All right. Did you -- did you make entries in
5   the journal prior to the time you worked at Chevron
6   Phillips?
7   A.   Yes.
8   Q.   What about during the time you worked at Chevron
9   Phillips?
10  A.   Yes.
11  Q.   What about after the time you worked at Chevron
12  Phillips?
13  A.   There may be some journals after, but not too
14  much.
15  Q.   Okay. All right. So, it's possible that there
16  are entries at some point in these journals we're talking
17  about that pertain to chronic fatigue syndrome but you're
18  not sure of that?
19  A.   That's right.
20  Q.   Okay. And this is -- these journals, where do
21  you maintain them? Where do you keep them, at home?
22  A.   Yeah.
23  Q.   Okay. Handwritten?
24  A.   Uh-huh.
25  Q.   Did you ever talk to Dr. Salvato about the -- and

Page 33

1   this is -- I'm assuming something that I should have
2   covered. But, anyhow, did you ever talk to Dr. Salvato
3   about the abuse you experienced at the hands of Terry
4   Lunsford?
5   A.   Yes.
6   Q.   All right. Is that something you talked to her
7   about frequently or maybe just mentioned once or twice, do
8   you know?
9   A.   Probably just mentioned it now and again. She
10  wasn't my doctor back then.
11  Q.   Right. That's what I was saying I assumed that I
12  probably shouldn't do, that she was your doctor back then.
13  A.   Yeah.
14  Q.   Who was your doctor back then?
15  A.   I don't know.
16  Q.   All right. Now, when did you start seeing
17  Dr. Salvato?
18  A.   In May of 2002 -- 2000 -- she was the doctor I
19  chose as my --
20  Q.   Like, your primary care physician?
21  A.   -- like, my primary care when I first got
22  insurance through Chevron Phillips. Both my sisters saw her
23  and she was around the corner from -- someone I could get to
24  easily from work.
25  Q.   Okay. So, you had not seen her prior to the time

## Page 34

1  you began working with Chevron Phillips; is that correct?
2  A. That's right. Now, in 1987 --
3  Q. Okay.
4  A. -- I saw her for three months.
5  Q. All right. What for?
6  A. Well, we did a lot of testing. I had -- I was
7  tired. I was, you know, having problems. She said -- I
8  honestly don't know if she said, "You have it," or, "You may
9  have it." It was very vague then. It wasn't real
10 clear-cut.
11 Q. Is it -- is this the first that you heard that
12 you may have
13 A. That's right.
14 Q. Is it all right if I call it that instead of
15
16 A. Yeah.
17 Q. Just trying to shorten my verbiage. So, if you
18 were diagnosed with it back then, it would have been
19 Dr. Salvato that made the diagnosis?
20 A. Yes, it would have.
21 Q. Okay. Is it possible that any other physician
22 made that diagnosis?
23 A. No, it is not.
24 Q. Have you seen any other physician besides
25 Dr. Salvato for

## Page 35

1  A. No.
2  Q. All right. And you didn't -- so, in 1987, you
3  saw her. Is that because one of your sisters referred you
4  to her?
5  A. That's right. My youngest one had seen an
6  article in the paper. She said, "You know, this kind of
7  sounds like what's going on. Why don't you go see her."
8  Q. Okay. All right. And you didn't see her again
9  until after several -- CP Chem?
10 A. That's right.
11 Q. Okay. I got kind of sidetracked. But back to
12 Mr. Lunsford -- have you been married besides your marriages
13 to him?
14 A. No.
15 Q. All right. How old are your sons? Your
16 children. I don't know if they're all sons or not.
17 A. All sons. 31, 26, 25.
18 Q. All right. Do they live in the area?
19 A. Uh-huh.
20 Q. Okay. Prior to work at Chevron Phillips,
21 where -- what was the job you had prior to moving to CP
22 Chem?
23 A. Worked for
24 Q. How long did you work there?
25 A. Two years.

## Page 36

1  Q. Do you recall the dates approximately? If you
2  don't, that's fine. I know --
3  A. I would -- no.
4  Q. I'm sure it's in the records somewhere.
5  A. Yeah. I don't. I don't.
6  Q. Okay. What did you do for
7  Schools?
8  A. I was the administrator's secretary.
9  Q. Okay.
10 A. I did the school newsletter, did school
11 brochures. I created the school brochures.
12 Q. All right. So, to whom did you report? I guess
13 it would have been the administrator.
14 A. Danna Curlee.
15 Q. Danna?
16 A. Uh-huh. D-a-n-n-a C-u-r-l-e-e, and that's my
17 sister.
18 Q. I was going to say I've seen that name somewhere.
19 A. That's my sister.
20 Q. All right. So, essentially, you reported to your
21 sister for a couple of years?
22 A. Uh-huh.
23 Q. How did that go?
24 A. Not bad. She's a real strong personality and I'm
25 a follow person.

## Page 37

1  Q. So, it worked out okay in that sense?
2  A. Uh-huh, uh-huh.
3  Q. Why did you leave there?
4  A. Because I had a chance to go work for Chevron
5  Phillips. A friend of mine had went to Temp Connection.
6  Q. Uh-huh.
7  A. -- and she said, "Oh, come see these people."
8  She wanted me to get on with her at Duke.
9  Q. Uh-huh.
10 A. And, instead, they sent me to CP Chem.
11 Q. Well, you left                          to
12 go to the Temp Connection, right?
13 A. Right.
14 Q. You didn't know you were going to CP Chem.
15 A. That's true.
16 Q. So, why did you initially decide to leave
17                               ?
18 A. Because of the possibility of making more money.
19 When I went to Temp Connection, they thought my skills were
20 good skills.
21 Q. Okay. Got it. Now, prior to
22              where did you work?
23 A. I was off for a while. That's during the time my
24 son almost died.
25 Q. Now, when you talk about that, are you talking

Lorin D. Netterville	October 10, 2006

Page 38

1 about your son having meningitis?
2   A.  (Witness nods head affirmatively.)
3   Q.  Which son?
4   A.  My youngest.
5   Q.  Okay. So, there was a period you were off while
6 he was sick?
7   A.  Yeah. And I worked some for        to make some
8 money.
9   Q.  What was your position with
10  A.  I car-hopped and I was the night manager.
11  Q.  How long did you hold that position?
12  A.  Probably six months.
13  Q.  Okay. Well, let's get to the next one and then
14 I'll try and fill in the time. So, prior to the time you're
15 off a while and also working      where did you work?
16  A.
17  Q.            What did you do for
18
19  A.  I was a registered --
20  Q.  Registered rep?
21  A.  Registered sales assistant.
22  Q.  Okay. Registered -- what's that mean?
23  A.  Means I took and passed the Series 7 and Series
24 63 to sell stocks and bonds and such in the State of Texas.
25  Q.  So, you were registered with the NASD then,

Page 39

1 right?
2   A.  I was.
3   Q.  When you were registered with the NASD, was it
4 under Netterville or Lunsford?
5   A.  Netterville.
6   Q.  All right. How long did you work at
7       approximately?
8   A.  Two-and-a-half years.
9   Q.  When you say "registered sales assistant," were
10 you a sales assistant to someone?
11  A.  Uh-huh. To stock brokers.
12  Q.  To whom? I mean, anybody in particular?
13  A.  Let's see if I can remember names. Jodi -- I
14 can't remember Jodi's last name. Jodi --
15  Q.  Male or female?
16  A.  Female. Susan.
17  Q.  Don't remember her last name either?
18  A.  No. I'm thinking. I don't remember. George.
19  Q.  Okay. Where were these folks located?
20  A.  Galleria.
21  Q.  So, you worked out of the Galleria area?
22  A.  Uh-huh.
23  Q.  It was actually in the Galleria?
24  A.  Uh-huh.
25  Q.  In one of the office buildings there?

Page 40

1   A.  Uh-huh. Yes.
2   Q.  Now, did you actually sell the securities or did
3 these stock brokers sell the securities?
4   A.  There was times I actually sold them.
5   Q.  So, what kind of products are we talking about,
6 what kind of financial products?
7   A.  Mostly mutual funds.
8   Q.  Okay.
9   A.  Did some retirement, small retirement accounts.
10  Q.  And what sort of customers did you deal with when
11 you sold these registered products? Individuals,
12 businesses?
13  A.  Yes -- no. Individuals.
14  Q.  How did you find them?
15  A.  They were -- be -- already be customers of
16 these -- these brokers and it would be somebody -- maybe
17 they'd come in and say, "I want to do something. So-and-so
18 broker's not in the office." That's why they got me
19 registered, so I could handle that.
20  Q.  Okay. All right. You said you worked there
21 two-and-a-half years?
22  A.  Uh-huh.
23  Q.  How long were you registered? Same period of
24 time?
25  A.  Two years.

Page 41

1   Q.  Okay. So, you started working there as a sales
2 assistant and then at some point became registered?
3   A.  Right.
4   Q.  How were you paid?
5   A.  I -- let's see. I don't know if it was biweekly
6 or 1st and 15th, and then I also got compensation from some
7 of the brokers themselves.
8   Q.  Well, were you commissioned partly or not?
9   A.  Uh-huh. No.
10  Q.  When you say compensation from some of the
11 brokers themselves, why did they --
12  A.  Because that was just the way it was done. If
13 you had an assistant that could do that --
14  Q.  Okay.
15  A.  -- then, you know, they -- the -- it was kind of
16 expected of you to --
17  Q.  All right. Do you know how much you made while
18 you worked there roughly per year, or is there a way to
19 quantify it?
20  A.  Seems like my -- my base salary was 33,000. One
21 year, I made 39,000. That was a -- one year.
22  Q.  All right.
23  A.  It was when I made a -- got quite a bit of broker
24 compensation that one year.
25  Q.  Okay. So, how much time --

## Page 42

1  A. That was --
2  Q. I'm sorry. Go ahead.
3  A. I'm sorry.
4  Q. No. I cut you off.
5  A. I don't know. I don't --
6  Q. Okay. How much time was there between
7  roughly? If you
8  don't know, that's fine. We can figure it out later.
9  A. I don't know. I'd have to figure that out.
10 Q. That's fine. Why did you leave the
11 job?
12 A. My son.
13 Q. He got sick?
14 A. Yeah. Yeah, and --
15 Q. Okay. So, when -- when your son recovered,
16 instead of going to                                  why
17 didn't you go back into the industry, the           sort
18 of thing?
19 A. Well, he had to have a lot of rehab and I just
20 couldn't do that and go to the Galleria.
21 Q. But couldn't you -- go ahead.
22 A. What?
23 Q. I was just going to ask -- you live in the
24 Pasadena area?
25 A. Uh-huh.

## Page 43

1  Q. Are there no brokerage shops out in that area, or
2  at the time there were none?
3  A. If there were, I didn't know about them.
4  Q. All right. Okay. Who did you report to at
5  
6  A. Laura -- I can see her. Laura.
7  Q. That's okay.
8  A. I --
9  Q. Prior to            where did you work?
10 A.
11 Q. What's that?
12 A. They're a bond house.
13 Q. So, sort of the same general industry?
14 A. Uh-huh.
15 Q. How long there?
16 A. One year.
17 Q. And then just real quick, prior to       where did
18 you work?
19 A.
20 Q. Okay. How long?
21 A. Two-and-a-half years, I think.
22 Q. Where were these -- where was
23 located?
24 A. Galleria.
25 Q. And what about --

## Page 44

1  A. Galleria.
2  Q. Okay. So, all of these are Galleria?
3  A. Uh-huh.
4  Q. All right. Prior to
5  A. Worked for a temporary agency,
6  Q. Okay.          was -- again, was that a
7  financial thing?
8  A. No.
9  Q. What was that?
10 A. That's a staffing -- it's            now.
11 Q. Oh,                 is?
12 A. Uh-huh.
13 Q. Got sucked up by           or something?
14 A. Uh-huh.
15 Q. Okay. Let me mark something real quick.
16     MR. McLAUGHLIN: Mr. Sustaita, I'm just going
17 to mark these "Netterville" or go by number, or do you want
18 to work sequentially or anything?
19     MR. SUSTAITA: That's fine.
20     MR. McLAUGHLIN: I really don't care.
21 Totally flexible myself about stuff like that.
22     (Netterville Exhibit No. 1 marked.)
23 Q. (BY MR. McLAUGHLIN) Ms. Netterville, I'm going
24 to pass over what I've marked as Netterville No. 1. Just
25 take a moment to look at it, if you would.

## Page 45

1  A. (Witness complies.)
2  Q. Have you had a moment to look at the document or
3  do you need more time?
4  A. Uh-huh. Huh-uh.
5  Q. Okay. Please articulate.
6  A. Oh, I'm sorry. No, I don't.
7  Q. That's okay. It happens all the time. It's not
8  a big deal. Okay. That's a resume you created; is that
9  right?
10 A. That's correct.
11 Q. Did you create it on a computer that you owned or
12 did you go to a Kinko's or -- or how did you create the
13 document?
14 A. I don't know. Can't -- I don't remember doing
15 it, so --
16 Q. Okay.
17 A. You know, I -- we had a computer at home, so it's
18 quite possible I did it there.
19 Q. All right. Did you -- do you see anything on
20 there that is not accurate?
21 A. Yeah. Well, I see where I wasn't accurate when I
22 said I was at             for three-and-a-half years. I
23 was only there a year and a half.
24 Q. Well, wait a minute. Are you talking about -- is
25 the resume accurate? That's what I'm asking. I probably

Lorin D. Netterville                                              October 10, 2006

## Page 46

1  didn't ask it very well?
2     A.  Well, yes.
3     Q.  You're comparing it with your prior testimony?
4     A.  Right.
5     Q.  That's fine. I understand that dates and stuff
6  aren't always going to be things you remember right off the
7  top of your head, but that's why -- if you'll look at the
8  resume and point out anything in here you think is not
9  accurate, then we can talk about whether it's the same or
10 different from your testimony and all that.
11    A.  Okay.
12    Q.  Anything in there that you see that is not
13 accurate?
14    A.  No.
15    Q.  Okay. That's fine. Now let's talk about your
16 work at CP Chem, if we could.
17    A.  Okay.
18    Q.  I'm going to go ahead and mark your application.
19        (Netterville Exhibit No. 2 marked.)
20    Q.  (BY MR. McLAUGHLIN) I'm passing to you what's
21 been marked Netterville No. 2.
22    A.  Okay.
23    Q.  Just take a moment, Ms. Netterville, and tell me
24 if you can identify that document.
25    A.  Yeah. Yes.

## Page 47

1     Q.  Okay. Is this an employment application?
2     A.  It is for employment.
3     Q.  Is it completed in your hand, or no?
4     A.  Yes, it is.
5     Q.  All right. And is it your signature on the third
6  page at the bottom?
7     A.  Yes, it is.
8     Q.  And the date is May 9, 2001, correct?
9     A.  That's right.
10    Q.  All right. Now, if you look at the first page at
11 the top, the date is April 5, 2001, correct? Do you see
12 where I'm -- I can point, if you like.
13    A.  Yes.
14    Q.  All right. When did you -- do you know when
15 approximately you began working at Chevron Phillips, you
16 know, as a temp?
17    A.  December --
18    Q.  Okay.
19    A.  -- 2000, I think -- or maybe first -- right at
20 the first of the month.
21    Q.  All right. Your -- if we look back at your
22 resume, the most recent position on there at the top is
23 November 1999 through present. And that's the
24          ' position, right?
25    A.  Uh-huh, uh-huh.

## Page 48

1     Q.  And you testified earlier that you went from
2                    ' to the            right?
3     A.  Uh-huh, uh-huh.
4     Q.  Does it sound about right that you would have
5  quit the                ' job around December of
6  2000?
7     A.  Uh-huh.
8     Q.  Okay. And you need to try to answer with a
9  "yes."
10    A.  Yes, yes, yes.
11    Q.  I forgot, too. I mean, I should be reminding you
12 and I'm not. Okay. What -- when you began working at CP
13 Chem through the Temp Connection, what department did you
14 work in?
15    A.  Specialty chemicals.
16    Q.  To whom did you report?
17    A.  Well, there's the kicker. I didn't know for
18 quite a while. I thought I reported to Dan Coombs because
19 that's who I was assigned to, but it took a while for me to
20 find out that I didn't report to Dan Coombs, I reported to
21 Gary Thurman.
22    Q.  Did it matter to you?
23    A.  Well, just that it was very confusing.
24    Q.  Who hired you when you went from temp to
25 full-time employee?

## Page 49

1     A.  Richard Jones.
2     Q.  Who's Richard Jones?
3     A.  He was -- he was, you know -- what was that
4  position called? He was the customer service -- head of
5  customer service. Something happened, and I don't know
6  what, and he was moved to another position and Gary became
7  the customer service. Maybe it was -- it was Richard when I
8  first came.
9     Q.  As a temp?
10    A.  Yeah.
11    Q.  Okay. So, it may be that when you joined up as a
12 temp, you were dealing with Richard Jones?
13    A.  Richard, yeah.
14    Q.  Is it possible or do you recall that maybe Gary
15 Thurman was the person who hired you?
16    A.  Yeah, yeah.
17    Q.  Okay.
18    A.  Gary then. I'm having to put it together in my
19 mind; but, yeah, that's right, Gary was the one who actually
20 gave me the letter -- offer of employment.
21    Q.  Okay. All right. And so when Gary hired you,
22 from that point forward, did you know you were reporting to
23 Gary Thurman or did you think you might be reporting to Dan
24 Coombs?
25    A.  No. By that point, I knew it was Gary Thurman.

**Page 50**

1  Q. Okay. So, it was during that temp period that
2  you didn't know who you were reporting to?
3  A. Uh-huh, yeah.
4  Q. Now, during your -- after you -- and I'm going
5  to -- when I ask you about during your employment as we're
6  having this discussion today, I'll be talking about the
7  period after which you stopped being a temp and started
8  being an employee, okay?
9  A. All right.
10 Q. And if you feel like you need to clarify it, just
11 feel free to do so. It's a little confusing because for a
12 portion of your employment, you were actually an employee of
13 the Temp Connection; and then for most of it, you were
14 actually an employee of Chevron Phillips.
15 A. That's right.
16 Q. Okay. So, during your employment, did you report
17 exclusively to Gary Thurman or did you report to Gary and
18 Dan or even more people, or what?
19 A. Well, yeah. I -- it was -- it was truly
20 confusing. It was Gary, it was Dan, it was Richard --
21 Q. Well, Richard was just while you were a temp.
22 Right or wrong?
23 A. Right, right, but that -- what I'm saying is when
24 I was first there. Okay. You're saying when I was first
25 there after I got hired?

**Page 51**

1  Q. Yes.
2  A. Oh, okay. Then I knew I was reporting -- Gary
3  was my direct supervisor, but Dan really directed my work.
4  Q. Did Gary report to Dan?
5  A. Yes.
6  Q. Let's go ahead and try and set the stage here for
7  as of the time after Gary hires you.
8  A. Uh-huh.
9  Q. Do you recall what Gary's title was at that time?
10 A. I'm -- something to do with customer --
11 Q. All right.
12 A. -- representative supervisor, something like
13 that.
14 Q. No problem. It will be on an e-mail that I
15 expect we'll mark one at some point today, so we'll see it
16 later. I just wanted to see if you remember.
17 A. Yeah. Something like that.
18 Q. Do you recall what Dan's title was at the time?
19 A. General manager.
20 Q. General manager. And you recall that for that
21 department -- wasn't it the specialty chemical department?
22 A. Uh-huh.
23 Q. Correct?
24 A. That's right. Thank you.
25 Q. For that department, is it true then that Dan was

**Page 52**

1  over the department?
2  A. That's right.
3  Q. And Gary reported to Dan?
4  A. That's right.
5  Q. And you reported to Gary?
6  A. Yes.
7  Q. Okay. Did you also work for Dan some?
8  A. Oh, that's who I did most of my work for.
9  Q. Okay.
10 A. That's why it was -- even after, it was
11 confusing.
12 Q. Was working for Dan problematic for you at all?
13 A. Sometimes.
14 Q. Why?
15 A. I felt like he didn't voice what he wanted from
16 me.
17 Q. Okay.
18 A. You know, I didn't know -- he -- he would tell
19 Gary and -- sometimes and -- it was just very confusing --
20 Q. Okay.
21 A. -- the whole situation like that, when you're
22 supposed to report to one person but you're mainly working
23 for another.
24 Q. Right.
25 A. It was -- it could cause problems.

**Page 53**

1  Q. So -- so, Dan wasn't -- if I hear you right, Dan
2  wasn't clear in his instructions to you. Is that part
3  correct?
4  A. Yes.
5  Q. And instead of dealing directly with you, he
6  would say something to Gary?
7  A. Exactly.
8  Q. And then you'd be dealing with Gary about it?
9  A. Right.
10 Q. Okay. I mean, does that characterize your
11 employment basically? Did that kind of repeat itself?
12 A. Yes.
13 Q. All right.
14    (Sotto voce discussion.)
15    MR. McLAUGHLIN: Do you need to take a break?
16 Let's take one.
17    (Recess from 11:16 a.m. to 11:29 a.m.)
18 Q. (BY MR. McLAUGHLIN) Ms. Netterville, do you need
19 to add anything to any prior testimony?
20 A. No.
21 Q. Not so far as you know anyhow.
22 A. No.
23 Q. Okay. We were talking about your work at Chevron
24 Phillips and sort of the dynamic between Dan Coombs, Gary
25 Thurman, and you, right?